609 A.2d 132

**In re 1991 PENNSYLVANIA LEGISLATIVE REAPPORTIONMENT COMMISSION.**

Supreme Court of Pennsylvania.

Argued Jan. 25, 1992.

Order Feb. 14, 1992.

Opinion May 1, 1992.

Reargument Denied June 29, 1992.

336

Joe Gambescia, John J. Gambescia, Philadelphia, for petitioners in No. 191 E.D. Misc. Docket 1991.

Stephen J. Harmelin, David H. Pittinsky, Laurence S. Shtasel, Barbara A. Brown, Philadelphia, for Pennsylvania Legislative Reapportionment Com'n [at all cases].

Ernest D. Preate, Jr., Atty. Gen. [at all cases].

Arthur Levy, Media, David E. Landau, Philadelphia, for petitioner in No. 200 E.D. Misc. Docket 1991.

Russell Walker, pro se.

Ken Gormley, Executive Director, Legislative, Reapportionment Com'n, Harrisburg, Barbara A. Brown, Stephen J. Harmelin, Dilworth Paxson Kalish & Kauffman, Philadelphia, Pa., for respondent in No. 124 W.D. Misc. Docket 1991.

Anthony J. Martin, Martin and Martin, P.C., Monroeville, for petitioner in 132 W.D. Misc. Docket 1991.

Stephen J. Harmelin, David H. Pittinsky, Barbara A. Brown, Philadelphia, Robert J. Cindrich, Chairman, Com. of Pa., Pa. Legislative Reapportionment Com'n, Harrisburg, for respondent in No. 132 W.D. Misc. Docket 1991.

Jack W. Connor, Uniontown, for petitioner in No. 134 W.D. Misc. Docket 1991.

Barbara A. Brown, Stephen J. Harmelin, Dilworth Paxson Kalish & Kauffman, Philadelphia, for respondent in 134, 135, 137, 141 and 138 W.D. Misc. Docket 1991.

Thomas Rabbitt Zajac, Uniontown, for petitioner in No. 135 W.D. Misc. Docket 1991.

James T. Davis, John Purcell, Davis & Davis, Uniontown, for petitioner in No. 136 W.D. Misc. Docket 1991.

Robert J. Cindrich, Chairman Commonwealth of Pa., Pa. Legislative Reapportionment Com'n, Harrisburg, Stephen J. Harmelin, Barbara A. Brown, Philadelphia, for respondent in No. 136 W.D. Misc. Docket 1991.

Dante G. Bertani, Greensburg, for petitioner in No. 137 W.D. Misc. Docket 1991.

Dante G. Bertani, Greensburg, for petitioner in No. 141 W.D. Misc. Docket 1991.

John H. Broujos, Carlisle, for petitioner in No. 50 M.D. Misc. Docket 1991.

Arthur Selikoff, Andrew S. Gordon, Harrisburg, for petitioner in No. 52 M.D. Misc. Docket 1991.

Angelo T. Almonti, Allentown, for petitioner in No. 53 M.D. Misc. Docket 1991.

Frederick E. Charles, County Sol., Thomas M. Caffrey, Deputy County Sol., for petitioner in No. 54 M.D. Misc. Docket 1991.

William H. Lamb, West Chester, David Norcross, Washington, D.C., for petitioner in No. 56 M.D. Misc. Docket 1991.

Andrew S. Gordon, Aruthur Selifoff, Harrisburg, F. Joseph Loeper, Drexel Hill, for petitioner in No. 57 M.D. Misc. Docket 1991.

Emory W. Buck, Lansdale, for petitioner in No. 196 E.D. Misc. Docket 1991.

John Randolph Prince, III, Philadelphia, for petitioner in No. 197 E.D. Misc. Docket 1991.

J. Matthew Wolfe, Philadelphia, for petitioner in No. 199 E.D. Misc. Docket 1991.

Mary F. Platt, Philadelphia, David Norcross, Washington, D.C., for petitioner in No. 201 E.D. Misc. Docket 1991.

Donald R. Walko, Jr., Pittsburgh, for petitioner in No. 133 W.D. Misc. Docket 1991.

Dennis J. Miller, Michael J. Mortimer, Pittsburgh, for petitioner in No. 138 W.D. Misc. Docket 1991.

Nicholas Sellers, Villanova, David F.A. Norcross, Linda A. Long, Washington, D.C., for petitioner in No. 190 E.D. Misc. Docket 1991.

Bruce S. Marks, Philadelphia, for petitioner in No. 194 E.D. Misc. Docket 1991.

William E. Miller, Jr., Donald M. Lewis, III, Harrisburg, for petitioner in No. 49 M.D. Misc. Docket 1991.

Eric B. Schnurer, Philadelphia, for petitioner No. 51 M.D. Misc. Docket 1991.

Before NIX, C.J., and FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## ORDER

PER CURIAM.

AND NOW, this 14th day of February, 1992, pursuant to Article 2, Section 17(d) of the Pennsylvania Constitution, this Court, after consideration of the objections raised in the above-captioned petitions, finds that the Final Plan of the 1991 Pennsylvania Legislative Reapportionment Commis-

sion is not contrary to law, and the Petitions for Review are denied.

The deadline of February 18, 1992 for filing of nominating petitions is hereby extended until the close of business hours on Friday, March 6, 1992.

It is further ordered that as to the nominating signatures acquired prior to the date of this order, the same shall be deemed valid as to timeliness, subject, however, to any other statutory challenge.

Opinions will follow.

LARSEN, J., did not participate in the consideration or decision of these cases.

FLAHERTY, J., did not participate in the consideration or decision of Nos. 190, 194, 196, 199 and 201 E.D. Misc. Dkt. 1991; Nos. 49 and 51 M.D. Misc. Dkt. 1991; and No. 138 W.D. Misc. Dkt. 1991.

PAPADAKOS, J., did not participate in the consideration or decision of Nos. 190, 194, 196, 199 and 201 E.D. Misc. Dkt. 1991; Nos. 49 and 51 M.D. Misc. Dkt. 1991; and No. 138 W.D. Misc. Dkt. 1991.

## OPINION

NIX, Chief Justice.

## FACTS

The Reapportionment Plan at issue is the third reapportionment plan since the 1968 amendment to the Pennsylvania Constitution that created the Legislative Reapportionment Commission. *See* Pa. Const. Art. II § 17.

The Legislative Reapportionment Commission consists of five members. *Id.* The majority and minority leaders of the House and the Senate, or their appointed deputies, choose the fifth member of the Commission as its chair. *Id.* If the Commission cannot agree on a chair, the Supreme Court is empowered by the Constitution to appoint the

chair. *Id.*[1] The Commission acts by a majority of its members. *Id.*

On September 25, 1991, a majority of the Commission adopted the preliminary Legislative Reapportionment Plan. After objections were filed by the petitioners and publicly heard at a meeting on October 9, 1991, the Commission adopted the final plan on November 15, 1991. That plan is now the subject of our review. Pursuant to Subsection 17(d) of Article II of the Pennsylvania Constitution, the above-captioned appellants filed appeals to this Court within thirty days. *See* Pa. Const. Art. II § 17. On January 25, 1992, oral argument was heard on twenty-three matters, and two matters were submitted on the briefs.

On February 14, 1992, this Court entered an order that the Final Plan was not contrary to the law and denied the appeals. In that order we stated that an opinion would follow.[2]

## ISSUES

The present issues before this Court are whether the Final Plan comports with the Pennsylvania and United States Constitutions and the Voting Rights Act. 42 U.S.C. § 1971, *et seq.* Twenty-five appellants raise a number of similar issues regarding different counties and representative and senatorial districts. These issues may be characterized in the following ways:

1) Did the Reapportionment Commission violate the constitutional requirement of compactness and contiguity

---

1. This year the Supreme Court appointed Robert J. Cindrich as chairman of the Legislative Reapportionment Commission. *See* In Re Appointment of Chairman of the Legislative Reapportionment Commission, Judicial Administration Docket No. 105A, May 6, 1991.

2. Mr. Justice Larsen did not participate in the consideration or decision of these cases.

 Mr. Justice Flaherty did not participate in the consideration or decision of Nos. 190, 194, 196, 199 and 201 E.D. Misc. Dkt. 1991; Nos. 49 and 51 M.D. Misc. Dkt. 1991; and No. 138 W.D. Misc. Dkt. 1991.

 Mr. Justice Papadakos did not participate in the consideration or decision of Nos. 190, 194, 196, 199 and 201 E.D. Misc. Dkt. 1991; Nos. 49 and 51 M.D. Misc. Dkt. 1991; and No. 138 W.D. Misc. Dkt. 1991.

and equality of population and the prohibition against the division of political subdivisions unless absolutely necessary?

2) Did the Reapportionment Commission's Final Plan violate Federal Constitutional law by depriving various appellants of their rights under the Fourteenth Amendment to the United States Constitution?

3) Does the Plan fail for lack of an effective date, or in the alternative, may the court declare the effective date?

4) Is the Reapportionment Commission prohibited from renumbering even-numbered Senatorial Districts in a year in which odd-numbered seats are elected, in order to avoid the possibility of a special election?

5) Does the Final Plan reflect political gerrymandering which deprives two aspirants of their rights to run for office in their former districts?

6) Did the Final Plan violate provisions of the Voting Rights Act, 42 U.S.C. § 1971, *et seq.*?

7) May this Court order Discovery of the Commission members to determine motives for the Reapportionment Plan?

## STANDARD OF REVIEW

■ The Constitution of this Commonwealth directs this Court to entertain appeals from any aggrieved person within thirty days of the filing of the final plan. Pa. Const. Art. II § 17(d). "If the *appellant establishes* that the final plan is contrary to law, the Supreme Court shall issue an order remanding the plan to the commission and directing the commission to reapportion the Commonwealth in a manner not inconsistent with such order." *Id.* (emphasis added). As the Constitution clearly states, and as we have held in the past, "to prevail in their challenge to the final reapportionment plan, appellants have the burden of establishing not ... that there exists an alternative plan which is 'preferable' or 'better', but rather that the final plan filed by the Pennsylvania Reapportionment Commission fails to meet constitutional requirements." *In re Reapportionment Plan for Pennsylvania General Assembly*, 497 Pa. 525,

532, 442 A.2d 661, 665 (1981); *see also Gaffney v. Cummings*, 412 U.S. 735, 750–51, 93 S.Ct. 2321, 2330–31, 37 L.Ed.2d 298 (1973) ("what is to happen to the Master's Plan if a resourceful mind hits upon a plan better than the Master's by a fraction of a percentage point? Involvements like these must end at some point but, that point constantly recedes if those who litigate need only produce a plan that is marginally better when measured against a rigid and unyielding population equality standard.").

■ Our Constitution empowers the Legislative Reapportionment Commission to reapportion the Commonwealth. Furthermore, this Court may only undertake to reapportion the Commonwealth if the Commission has not filed a plan within the constitutionally prescribed time limits, Pa. Const. Art. II § 17(g); absent that, this Court may only remand an unconstitutional plan back to the Commission for redrafting. *Id.* at § 17(d).

## BACKGROUND

In the landmark decision recognizing the link between state legislative apportionment and the right to equal protection under the laws of the states in the Fourteenth Amendment to the United States Constitution, the Supreme Court of the United States in *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), held that "the Equal Protection clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as practicable". *Id.* at 577, 84 S.Ct. at 1388. The Court established a framework for states to reapportion legislative districts built upon the notion that "the overriding objective must be substantial equality of population among the various districts." *Id.* at 579, 84 S.Ct. at 1390. The Court recognized that the states have a legitimate interest "to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme." *Id.* at 578, 84 S.Ct. at 1390. Because those two notions of equality of population and integrity of politi-

cal subdivisions necessarily conflict, the Court clearly established equality of population as the controlling factor, holding that "permitting deviations from population based representation does not mean that each local governmental unit or political subdivision can be given separate representation regardless of population." *Id.* at 580–81, 84 S.Ct. at 1391–92.

At the same time that the Supreme Court of the United States was reviewing the state apportionment plan of the State of Alabama, this Court sustained the objections of Pennsylvania voters to the current reapportionment statutes. In *Butcher v. Bloom* [hereinafter referred to as *Butcher I*], 415 Pa. 438, 203 A.2d 556 (1964), this Court, having heard oral argument on the case prior to the filing of the opinion in *Reynolds v. Sims, supra,* relied on the United States Supreme Court's ruling in its disposition of the case. This Court reviewed Sections 16 and 17 of Article II of the Pennsylvania Constitution of 1874 which governed the reapportionment of Senate and House districts in the Commonwealth after each federal decennial census. *Id.,* 415 Pa. at 444, 203 A.2d at 559.[3] This Court held that these constitutional provisions did not violate the Fourteenth Amendment to the United States Constitution. *Id.,* 415 Pa.

3. Those two sections provide as follows:

**Sec. 16. Senatorial districts; ratio**

The State shall be divided into fifty senatorial districts of compact and contiguous territory as nearly equal in population as may be, and each district shall be entitled to one Senator. Each county containing one or more ratios of population shall be entitled to one Senator for each ratio, and to an additional Senator for a surplus of population exceeding three-fifths of a ratio, but no county shall form a separate district unless it shall contain four-fifths of a ratio, except where the adjoining counties are each entitled to one or more Senators, when such county may be assigned a Senator on less than four-fifths and exceeding one-half of a ratio; and no county shall be divided unless entitled to two or more Senators. No city or county shall be entitled to separate representation exceeding one-sixth of the whole number of Senators. No ward, borough or township shall be divided in the formation of a district. The senatorial ratio shall be ascertained by dividing the whole population of the State by the number fifty.

**Sec. 17. Representative districts**

The members of the House of Representatives shall be apportioned among the several counties, on a ratio obtained by dividing the

at 461–65, 203 A.2d at 570–571. However, the finding was coupled with a new interpretation that the prohibition of dividing wards, boroughs or townships in Section 16 must be "subject always to the overriding objective and mandate that such district shall be 'as nearly equal in population as may be.'" *Id.*, 415 Pa. at 463, 203 A.2d at 570 (quoting Pa. Const. of 1874, Art. II § 16). Likewise, the mandate in Section 17 that "each county shall have at least one representative", Pa. Const. of 1874 Art. II § 17, was interpreted "to require that counties with small population, if necessary, be joined with other counties for the purpose of electing and sharing a representative." *Id.*, 415 Pa. at 465, 203 A.2d at 571. This interpretation of the Pennsylvania Constitution received the approval of the Supreme Court of the United States. *Scranton v. Drew*, 379 U.S. 40, 85 S.Ct. 207, 13 L.Ed.2d 107, *vacating Drew v. Scranton*, 229 F.Supp. 310 (M.D.Pa.1964).[4]

This Court ordered that the 1964 elections be held according to the then existing reapportionment scheme, but re-

population of the State as ascertained by the most recent United States census by two hundred. Every county containing less than five ratios shall have one representative for every full ratio, and an additional representative when the surplus exceeds half a ratio; but each county shall have at least one representative. Every county containing five ratios or more shall have one representative for every full ratio. Every city containing a population equal to a ratio shall elect separately its proportion of the representatives allotted to the county in which it is located. Every city entitled to more than four representatives, and every county having over one hundred thousand inhabitants shall be divided into districts of compact and contiguous territory, each district to elect its proportion of representatives according to its population, but no district shall elect more than four representatives. Pa. Const. of 1874 Article II §§ 16, 17.

**4.** At the same time that this Court was hearing *Butcher I,* the United States District Court for the Middle District of Pennsylvania had declared that Section 16 and 17 of Article II of the Pennsylvania Constitution violated the Fourteenth Amendment guarantee of equal protection in the United States Constitution. *See* 229 F.Supp. 310; *Butcher I,* 415 A.2d at 443 n. 5, 203 A.2d at 559 n. 5. The District Court enjoined state officials from conducting the 1964 elections. A stay was granted on the District Court order pending appeal to the Supreme Court of the United States, and that Court vacated the District Court's judgment based upon this Court's holding in *Butcher I. Scranton v. Drew,* 379 U.S. at 42, 85 S.Ct. at 208; *see Butcher v. Bloom,*

tained jurisdiction in the case. We declared that the reapportionment statutes were unconstitutional, and that the 1966 election could not be held under the unconstitutional statutes. Because of the inaction of the General Assembly, on September 25, 1965, this Court proceeded to reapportion the Commonwealth; after receiving proposals from various parties in interest, we adopted a new plan for the reapportionment of the state into fifty Senatorial Districts and two hundred three Representative Districts. *Butcher II*, 420 Pa. at 310, 216 A.2d at 459. In addition, the Court ordered that the 1966 plan remain "in force and effect until constitutionally altered." *Id.*

In 1968 the citizens of Pennsylvania amended the Constitution, and merged former Sections 16 and 17 into the amended Section 16. Pa. Const. Art. II § 16 (as amended); *see Commonwealth ex rel. Specter v. Levin*, 448 Pa. 1, 5, 293 A.2d 15, 18 (1972). This Section now provides:

> The Commonwealth shall be divided into fifty Senatorial District and two-hundred and three Representative Districts, which shall be composed of compact and contiguous territory as nearly equal in population as practicable. Each Senatorial District shall elect one Senator and each Representative District one Representative. Unless absolutely necessary, no county, city, incorporated town, borough, township or ward shall be divided in forming either a Senatorial or Representative district.

Pa. Const. Art. 2 § 16.

## DISCUSSION

■ After both the 1970 and 1980 Federal Census, this Court reviewed the constitutionality of the Pennsylvania Legislative Reapportionment Commission Final Plans. *See In re Reapportionment Plan for Pennsylvania General Assembly*, 497 Pa. 525, 442 A.2d 661 (1982) (hereinafter *In re Reapportionment Plan* ); *Commonwealth ex rel. Specter v. Levin*, 448 Pa. 1, 293 A.2d 15, *appeal dismissed*, 409

[hereinafter referred to as *Butcher II* ], 420 Pa. 305, 308 n. 7, 216 A.2d 457, 458 n. 7 (1966).

U.S. 810, 93 S.Ct. 44, 34 L.Ed.2d 65 (1972) (hereinafter *Specter*). In *Specter*, we held that "the 'overriding objective' of any plan must be 'substantial equality of population among the various districts.'" 448 Pa. at 13, 293 A.2d at 21 (quoting *Reynolds v. Sims*, 377 U.S. 533, 579, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506 (1964)). We recognized the inherent conflict in the Pennsylvania Constitution between the goal of equally populated districts and the directive against dividing any counties, cities, incorporated towns, boroughs, townships or wards. *In re Reapportionment Plan*, 497 Pa. at 535–36, 442 A.2d at 666.

> With a fixed number of legislative seats to be apportioned "as nearly equal in population as practicable" and a "population density of this state [that] is quite uneven" in any apportionment scheme there is a certain degree of unavoidable noncompactness and a certain amount of subdivision fragmentation [that] is inevitable.

*Id.* (quoting *Specter*, 448 Pa. at 17–18, 293 A.2d at 23). We continue to hold the view that the equality of population necessitates dividing political subdivisions. It would defy logic to argue that counties cannot be divided to apportion the senatorial and the representative districts when the ideal senatorial district population is 237,633, and the ideal representative district population is 58,531, yet fifteen counties have greater populations than the ideal senate district, and forty counties exceed the ideal representative district population. *See* 110 Pa. Manual 533 (1991).

The 1991 Final Plan has a total population deviation in its fifty senatorial districts of 1.87% from the ideal population of 237,633. The population deviation for the 203 representative districts is 4.94% from the ideal population of 58,531. This plan compares favorably with the final plans in *Specter* and *In Re Reapportionment Plan*.[5]

█ The Appellants argue that the population equality is not so important that it warrants the division of counties

5. Total Percentage Deviation from Ideal District Population (Ideal in Parentheses)

and other political subdivision. They cite federal precedent which has upheld state reapportionment plans with variances of up to 16%.[6] Appellants argue that these cases bind this Court to require greater populations variances to protect the sanctity of political subdivision borders. Appellants are incorrect. The Supreme Court of the United States held that "some deviations from the equal population principle *are constitutionally permissible* with respect to the reapportionment of seats in a state legislature." *Reynolds v. Sims*, 377 U.S. at 579, 84 S.Ct. at 1390 (emphasis added). This language merely allows a state to apportion seats between districts that are not strictly equal in population; it does not mandate it. Our Constitution requires that the overriding objective of reapportionment is equality of population, and in 1972 and 1981 this Court approved plans in which the overriding objective was equality of population. We see no reason now in 1992 to retreat from those earlier holdings.

## EFFECTIVE DATE

Appellants raise the issue of the effective date of the 1992 Reapportionment Plan. Two arguments are raised. First, the plan is unconstitutional because it does not state the effective date and therefore one appellant whose residence is now outside of his senatorial district may not be able to retain his office. The same appellant asked this Court to exercise its extraordinary jurisdiction to declare an effective date of the Plan after the November 1992 election.

| | Senate | House |
|------|-----------|-----------|
| 1991 | 1.87% | 4.94% |
| | (237,633) | (58,531) |
| 1981 | 1.93% | 2.81% |
| | (237,334) | (58,456) |
| 1971 | 4.31% | 5.45% |
| | (235,949) | (58,113) |

6. *See Brown v. Thomson*, 462 U.S. 835, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983) (average deviation of 16%); *Gaffney v. Cummings*, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973) (7.83% maximum deviation); *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) (9.9% maximum deviation).

The Constitution of the Commonwealth of Pennsylvania is very clear on the effective date of a Reapportionment Plan. Pa. Const. Art. II § 17(e). It states in pertinent part:

> *"When the Supreme Court has finally decided on an appeal* or when the last day for filing an appeal has passed with no appeal taken, *the reapportionment plan shall have the force of law* and the districts therein provided shall be used thereafter in elections to the General Assembly until the next reapportionment as required under this section 17."

*Id.* (emphasis added).

Appellants request that we declare the effective date to be after the 1992 election with respect to those senatorial districts that are not slated for general election in 1992, i.e., the even-numbered Senatorial Districts. We have no power to grant that relief as our Constitution sets the effective date of the plan as above. The effective date of this plan was February 14, 1992, the day that this Court issued an order dismissing the above appeals.[7]

## 44TH DISTRICT

The Final Plan includes a new Senatorial District No. 44 comprising parts of Chester, Lehigh, Berks and Montgom-

---

7. Appellant Lewis raises a residency issue as well in his appeal from the final plan, and alleges that it will be impossible for an incumbent senator to have resided in his district for a year before the election, and for all four years of his tenure (as mandated by the Constitution) if the Senatorial Districts are altered by the Reapportionment Commission. This issue is not yet ripe for review because no senator has suffered adverse consequences in the form of losing a seat for failure to satisfy the residency requirement. However, we would note that the constitutional residency requirements may conflict with the constitutional mandate of reapportioning the Commonwealth every ten years. In light of that conflict, it may be necessary that residency requirements be waived when the Commission reapportions the Commonwealth less than one year before an election. These issues and possible resolutions are for the Senate to decide. *See In re Jones*, 505 Pa. 50, 476 A.2d 1287 (1984). This Court will reserve ruling on this issue until such time that a particular party suffers injury at which point we will address the apparent conflict between the constitutional provisions.

ery counties. The former Senatorial District 44 in Western Pennsylvania was merged with District 43. District 44, as an even-numbered District, is not slated for a general election until 1994. *See* 25 P.S. § 2209. Appellants Senator Frank Pecora, Republican Committee of Chester County, and Senator F. Joseph Loeper argue that the new district must be odd-numbered to prevent a lapse in representation. The Commission responds with the argument that neither this Court nor the Commission has the authority to declare the 44th District vacant, but only the Senate has the power. Furthermore, the Commission argues that the citizens in District 44 will not be deprived of a Senator because a special election may be called in the event of a vacancy. *See* 25 P.S. § 2778.

Appellants argue that the staggered election mandated by Section 2209 of the Election Code, 25 P.S. § 2209, will be interrupted by the creation of a new even-numbered district. They argue that the only time the election scheme was interrupted was in 1966 when this Court reapportioned the Commonwealth and ordered that the Senators from the odd numbered-districts be only elected for two years. *See Butcher II*, 420 Pa. at 310, 216 A.2d at 459. Appellants argue that only when this Court declares a prior plan unconstitutional and undertakes to reapportion the Commonwealth itself may the terms of office be shortened. Because this Court had declared in 1964 that the plan was unconstitutional, *Butcher I*, 415 Pa. at 455 and 468, 203 A.2d at 566 and 573, the candidates and incumbents were on notice that their terms may be truncated.

The Constitution clearly states that "the reapportionment shall have the force of law and the districts therein provided shall be used thereafter in elections to the General Assembly *until the next reapportionment as required under this Section 17."* Pa. Const. Art. II § 17(e) (emphasis added). The Constitution does not state "if required." Thus on its face the Constitution clearly establishes a termination date for the reapportionment plan. Nowhere in Section 17 is there authorization to continue to use a prior

plan, and if the Commission fails to produce a plan within the prescribed time limit, "the Supreme Court shall immediately proceed on its own motion to reapportion the Commonwealth." Pa. Const. Art. II § 17(g). Therefore, each Senator, whether in an odd- or even-numbered District, is on notice after a Federal Decennial Census that the prior reapportionment plan is no longer effective and the new districts may be drawn in a manner that separates the Senators' districts from their residences. Senator Pecora's and Senator Lewis' appeals are similarly grounded in the fact that the Senators' residences are no longer located within the senatorial districts that they represent. Their only difference is one of degree, i.e., Senator Pecora lives hundreds of miles away from his district, while Senator Lewis only lives in the neighboring district. However, the result is exactly the same. The districts in question are not slated for election until 1994 yet neither district has its duly elected senator residing within its borders.

▇ Our review of the Plan is limited to those enumerated constitutional requirements in Section 16 of Article II of our Constitution. That Section does not include a requirement that all senatorial districts be redrawn in such a manner that incumbent senators remain residents of their redrawn districts. The party leaders of both houses of the General Assembly adequately represent the interests of incumbents and it is within their sole discretion as members of the Legislative Reapportionment Commission to consider those interests when renumbering and redrawing the legislative districts.

▇ In addition, Senators Pecora and Lewis are not automatically expelled from their Senate seats by the Commission's actions. Only the Senate has the authority to judge the qualifications of its members. *In re Jones,* 505 Pa. 50, 58, 476 A.2d 1287, 1290–91 (1984); *see* Pa. Const. Art. II § 9. In *Jones* we held:

Article II is concerned with the composition, powers and duties of the legislature. Nothing in this article even remotely suggests the conference of jurisdiction upon the

courts to test the qualifications of the members of the General Assembly. Indeed, Section 9 of Article II expressly states that each body of the General Assembly shall be the judge of the qualifications of its members. *In re Jones,* 505 Pa. at 58, 476 A.2d at 1291 (footnote omitted). Thus the Senators incorrectly characterize the Commission's actions as depriving the Senators of their offices.

■ Assuming that the Senate does not seat Senators Pecora and Lewis, nonetheless the Senators are not being deprived of a constitutionally protected interest. Appellants' interest in their offices is a "highly circumscribed" interest. *Sweeney v. Tucker,* 473 Pa. 493, 524, 375 A.2d 698, 713 (1977).

An elected office is a public trust, not the private domain of the officeholder. A member of the Legislature has a profound responsibility to represent his constituents in the formation of public policy in this state. He holds office for the benefit of his constituents ... [and] is periodically accountable to his constituents through the electoral process.... A member of the Legislature is thus subject to the political process at all times.... This is properly so for the public interest in the office far outweighs any private interest of the officeholder. An elected official can never have tenure in the same sense as an ordinary public employee.

*Id.* Thus as we have held in the past, elected officials' interest in their offices does not merit constitutional protection. *Id. See also In re Reapportionment of the School District of the City of Pittsburgh,* 507 Pa. 128, 488 A.2d 1106 (1985) (school directors have no legal right to serve out their elective terms superceding need for reapportioning of school districts); *Commonwealth v. Moir,* 199 Pa. 534, 49 A. 351 (1901); *Lyons v. City of Pittsburgh,* 137 Pa. Commw. 330, 586 A.2d 469, *allocatur denied,* 527 Pa. 670, 593 A.2d 845 (1991).

■ These appellants, and the Republican Committee of Chester County and Senator Loeper raise the argument that

the citizens of the Sixth and Forty-fourth Senatorial Districts will be without senators for the next two years and will be deprived of the right to petition the government for redress of their grievances. This argument also fails.

If the Senate will not seat Senators Pecora and Lewis, the citizens of the district will be represented in the Senate by operation of the special election statute. *See* 25 P.S. § 2778.[8] Anytime a vacancy occurs in a legislative district, the presiding officer of the house is required to call for a special election. *Id.* This is regardless of the underlying cause of the vacancy, be it death, resignation or expulsion. It is to be noted that the appellants are not arguing that the special election statute itself is an unconstitutional deprivation of the citizen's right to elect legislators and to petition the government for redress of grievances. No persuasive reason has been offered to hold that the special election statute in its application to a vacancy created by the reapportionment is unconstitutional.[9]

---

**8. § 2778. Special elections for Senator and Representative in The General Assembly**

Whenever a vacancy shall occur in either house of the General Assembly whether or not it then be in session, the presiding officer of such house shall issue a writ of election to the proper county board or boards of election and to the Secretary of the Commonwealth, for a special election to fill said vacancy, which election shall be held on a date named in the writ, which shall be not less than sixty (60) days after the issuance of said writ. The presiding officer may fix, in such writ of election, the date of the next ensuing primary, municipal or general election as the date for holding any such special election: Provided, however, That should the Governor after the issuance of said writ of election advise the presiding officer that the General Assembly will be called into extraordinary session prior to the date set for such special election, the presiding office may countermand the writ theretofore issued and shall issue a new writ of election, fixing therein such earlier date therefor as is deemed expedient, but which shall not be less than sixty (60) days after the issuance of said writ.

**9.** This Court has never addressed the constitutionality of the special election statute for members of the General Assembly. However, in an analogous case, the United States Court of Appeals for the Third Circuit upheld as constitutional the special election statute governing a temporary vacancy in a United States Senate seat. *Trinsey v. Commonwealth of Pennsylvania,* 941 F.2d 224 (3rd Cir.) *rev'g* 766 F.Supp. 1338 (E.D.Pa.), *cert. denied,* —— U.S. ——, 112 S.Ct. 658, 116 L.Ed.2d 750 (1991).

## GERRYMANDERING

Appellants' claims may be categorized as a denial of access to the political process. They include a claim of political gerrymandering, a claim of deprivation of free and equal elections, and a violation of equal protection under the State and Federal Constitutions. These arguments fail.

 The Supreme Court of the United States in *Davis v. Bandemer*, 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986), addressed the political gerrymandering issue in the Indiana General Assembly's Reapportionment Plan after the 1980 census. In that case, the Court upheld the General Assembly's plan which allegedly disadvantaged the Democratic Party. The Court held that a political gerrymandering claim was a justiciable question and that members of one political party could bring a cause of action under the 14th Amendment to the Constitution of the United States Constitution alleging that their votes had been intentionally rendered ineffective to elect the representative of their choice. *Id.* at 126–28, 106 S.Ct. at 2807–08. The Court however, reversed the District Court's verdict in favor of the Democrats because they had failed to establish a case. *Id.* at 143, 106 S.Ct. at 2815. The Court set out the following elements to prove a case: the plaintiff must establish: 1) intentional discrimination against an identifiable political group; 2) an actual discriminating effect on that group; and 3) a "history of disproportionate results appear[ing] in conjunction with strong indicia of lack of political power and the denial of fair representation." *Id.* at 139, 106 S.Ct. at 2814. This Court is persuaded by the holding of the Supreme Court of the United States with regard to the elements of a *prima facie* case of political gerrymandering. No appellant here who raises a political gerrymandering claim has established the requisite elements under the three-part test as set forth in *Davis v. Bandemer, supra.*

 Appellants Jones' and Roberts' claims of political gerrymandering fail because they are individual candidates

seeking to run against incumbents without any evidence of their being part of an identifiable group suffering a history of disenfranchisement or lack of political power. There is no precedent in this state nor in the Federal Courts for a claim arising from the deprivation of an individual's right to run for a particular office nor of a citizens' right to vote for a specific individual.

 Appellants claim that the plan violates the constitutional mandate that "[e]lections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." Pa. Const. Art. I § 5. This plan does not violate Section 5 of Article I of our Constitution. This Court has defined Section 5 in the following manner:

'[E]lections are free and equal within the meaning of the Constitution when they are public and open to all qualified electors alike; when every voter has the same right as any other voter; when each voter under the law has the right to cast his ballot and have it honestly counted; when the regulation of the right to exercise the franchise does not deny the franchise itself, ... and when no constitutional right of the qualified elector is subverted or denied him.'

*City Council of City of Bethlehem v. Marcincin*, 512 Pa. 1, 8, 515 A.2d 1320, 1232 (1986) (quoting *Shankey v. Staisey*, 436 Pa. 65, 69, 257 A.2d 897, 898 (1969), *cert. denied*, 396 U.S. 1038, 90 S.Ct. 684, 24 L.Ed.2d 682 (1970)). Using this analysis, we find that the Commission's final plan in no way deprives Appellants or any citizens of this Commonwealth of their right to free and equal elections. A candidate's interest in a specific office can only be less than the incumbent's interest, which has already been characterized as "highly circumscribed". *Sweeney v. Tucker*, 473 Pa. at 524, 375 A.2d at 713. The aspirant has a right to run in his district for any office for which he is qualified; however, his right to run for office does not rise to a constitutionally protected level requiring the Legislative Reapportionment Commission to tailor its plan around the residences of

political aspirants who seek to challenge a specific incumbent.

## VOTING RIGHTS ACT

Several appellants raise objections to the Final Plan based upon the Voting Rights Act, 42 U.S.C. § 1971 *et seq.* (1988). The specific section implicated is Section 2 of the Act which provides:

**§ 1973. Denial or abridgement of right to vote on account of race or color through voting qualifications or prerequisites; establishment of violation**

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973 (1988). The United States Supreme Court described the intended scope of the section as follows:

Subsection 2(a) prohibits all States and political subdivisions from imposing *any* voting qualifications or prereq-

uisites to voting, or any standards, practices, or procedures which result in the denial or abridgment of the right to vote of a citizen who is a member of a protected class of racial and language minorities. Subsection 2(b) establishes that § 2 has been violated where the "totality of the circumstances" reveal that "the political processes leading to nomination or election ... are not equally open to participation by members of a [protected class] ... that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."

*Thornburg v. Gingles,* 478 U.S. 30, 43, 106 S.Ct. 2752, 2762, 92 L.Ed.2d 25 (1986) (quoting 42 U.S.C. § 1973(b)).

It must be recognized that Appellants Loeper, *et al.,* are not bringing an action for relief under the Voting Rights Act, but rather they are challenging the proposed plan on the ground that it does not conform with the Act.[10] They assert that the establishment of minority/majority districts can only be satisfied by providing for the creation of districts which provide the minority/majority district with a 65% minority population. They argue that the Final Plan (with 60% to 62% proportions) fails to comply with the provisions of the Act and, therefore, must be rejected in favor of the plan they offer which establishes the required 65% proportion under the Act. They characterize the dis-

---

**10.** Appellants Clarence Thompson, Leroy Green and Henrietta Bennett all raise claims under Section 2 of the Voting Rights Act as "aggrieved persons", 42 U.S.C. § 1973. While it is true that they satisfy the standing requirements, *see Roberts v. Wamser,* 883 F.2d 617, 621 (8th Cir.1989) ("those seek[ing] judicial enforcement of the prohibition against the infringement of the right to vote on account of race"), they are not in the proper forum to prosecute a claim under the Voting Rights Act. *See* 42 U.S.C. § 1971(d) (granting jurisdiction to the United States District Courts).

Our Constitution requires this Court to determine whether "the plan is contrary to law." Pa. Const. Art. II, § 17(d). Therefore, the plan must be in accord with both State and Federal Law. In this instance it is being argued that Federal Law (i.e., the Voting Rights Act) would be violated by the final plan. Thus, we are called upon to address the legitimacy of the appellants' claim. For the reasons set forth in the text, it is our view that the plan is not contrary to the Voting Rights Act.

tricts created under the Commission's plan as minority influence districts, thus assuming the premise they seek to establish. The question presented for our resolution is whether the Commission's plan is defective in this regard. Thus the lynchpin of the Appellants' argument is that, absent the establishment of a 65% minority population, the Commission's plan is fatally flawed and thus must be rejected. For the reasons that follow, we find this assertion to be without merit.

The Voting Rights Act, 42 U.S.C. §§ 1971 to 1973bb–1, as amended in 1982, established a statutory cause of action which recognizes claims charging that a "standard, practice, or procedure" *results* in discrimination on the basis of race. 42 U.S.C. § 1973 (hereinafter referred to as Section 2 of the Voting Rights Act). In 1982, Congress amended Section 2 of the Voting Rights Act in response to the United States Supreme Court decision in *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980).

In *Bolden*, a class action was successfully brought in the United States District Court for the Southern District of Alabama on behalf of the Black residents of the City of Mobile. The suit alleged that the City's practice of electing commissioners at large by majority vote unfairly diluted the voting strength of Blacks in violation of the Fourteenth and Fifteenth Amendments of the Federal Constitution. *Id.* The District Court found the City's plan unconstitutional, and the United States Court of Appeals for the Fifth Circuit affirmed the District Court's ruling. *Id.* at 58, 100 S.Ct. at 1494. On appeal, the United States Supreme Court, although unable to agree on a majority opinion, reversed the decision of the United States District Court. Justice Stewart, in an Opinion Announcing the Judgment of the Court, joined by then Chief Justice Berger and Justices Powell and Rehnquist, reasoned that, once the court below found that Blacks could register and vote without hindrance, it was error to find that the Fifteenth Amendment was offended. *Id.* at 65, 100 S.Ct. at 1498. This conclusion was based upon the premise that the Fifteenth Amendment does not guaran-

tee the right to have Black candidates elected, but prohibits only intentionally discriminatory denial or abridgment by the government of the freedom to vote on account of race. These justices also found no purposeful discrimination in the voting practices under the guarantee of equal protection under the Fourteenth Amendment in view of the failure of the evidence presented to establish that the at-large voting practice was a purposeful device to further racial discrimination. *Id.* at 74, 100 S.Ct. at 1503.[11]

In dissent, Mr. Justice Marshall articulated the view that proof of a discriminatory purpose to support a claim of vote dilution in violation of the Fourteenth and Fifteenth Amendments is not necessary. *Id.* at 103–105, 100 S.Ct. at 1518–20. To the contrary, he reasoned that the City's at-large electoral scheme was violative of the Fourteenth and Fifteenth Amendments since it had the unconstitutional effect of diluting the Black vote.[12] He reasoned that even if it were necessary to support a claim under these constitutional amendments with a showing of discriminatory purpose, that requirement had been satisfied by showing that official action was produced by pervasive racial bias as shown in the evidence in the case under consideration.

Justice Brennan dissented and agreed with Justice Marshall that proof of a discriminatory impact was sufficient in the matter then before the Court and alternatively that discriminatory intent had been proven. *Id.* at 94, 100 S.Ct. at 1513. Justice White also in dissent expressed the view

11. Justice Blackmun concurred in the result, *id.* at 80, 100 S.Ct. at 1506, and Justice Stevens concurred in the judgment, *id.* at 83, 100 S.Ct. at 1508.

12. One distinction between the opinion of the Court and the dissenting opinion of Mr. Justice Marshall is that Mr. Justice Marshall characterized the right to cast an effective vote as fundamental. As a result, the deprivation of a fundamental right requires strict scrutiny without any showing of discriminatory purpose. This differs from the plurality's decision that the only fundamental right is participation on equal footing with other voters. There is no constitutional right to equal representation for identifiable political groups, and, therefore, a deprivation of the right to equal representation based upon racial consideration must be accompanied by a discriminatory purpose in order to merit strict scrutiny.

that discriminatory purpose could be and had correctly been inferred from the evidence of discriminatory impact. *Id.* at 94–103, 100 S.Ct. at 1513–18.

Following the *Bolden* decision,[13] the Supreme Court in *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), set forth the elements that must be established by plaintiffs to declare a plan violative of the Voting Rights Act. The Court required the plaintiffs to show that:

> [F]irst, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single number district.... [S]econd, the minority group must be able to show that it is politically cohesive.... [T]hird, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate.

*Id.* at 50–51, 106 S.Ct. at 2766–67 (citations and footnote omitted).

We will first address the complaint being raised to the Plan as it relates to the Senatorial Districts representing the City of Philadelphia. Appellants argue that the plan for Philadelphia fails to provide for any minority/majority districts where the minority population warrants such districts. Specifically, appellants assert that the plan drafted by the Commission has no "classic [Senatorial] minority/majority districts." Appellants argue that the Commission "deliberately created a retrogressive plan resulting in the destruction of the three existing minority/majority seats and replacing them with four minority influence districts." Appellants further charge that their proposed plan included four "classic" minority/majority senatorial districts within Philadelphia.

**13.** As a result of the *Bolden* decision, Congress, in 1982, amended the Voting Rights Act and created what is now known as the "results test". The Supreme Court, in 1986, interpreted the "results test" for the first time after the amendment in *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

Prior to the 1991 reapportionment, three out of the seven Senatorial Districts from Philadelphia were minority/majority districts, each being represented by Black senators.[14] The plan proposed by the Commission also provides for a fourth minority/majority senatorial seat for Philadelphia. In both the Commission's plan and the plan proposed by the petitioners, the four proposed Senatorial Districts would contain a majority of voting age minorities. The issue being raised is the size of the minority's voting age proportion that is required under Section 2 of the Voting Rights Act to be classified as a minority/majority district.

 It must be emphasized that the scope of the instant challenge is very narrow. The test that has been established for determining the viability of the Commission's plan is whether or not the plan meets constitutional requirements. Pa. Const. Art. II § 17(d). The mere fact that other plans may be offered is of no moment, unless appellants establish that the plan submitted by the Commission is "contrary to law." Pa. Const. Art. II § 17(d); *see In Re Reapportionment Plan*, 497 Pa. at 532, 442 A.2d at 665; *see also Gaffney v. Cummings*, 412 U.S. at 750–51, 93 S.Ct. at 2330–31. Once that plan is found to meet constitutional mandates, the issue of the merits of any proposed plan is irrelevant. *Id.*

 The issue to be focused upon is the interpretation sought by appellants to determine when a group is to be considered "sufficiently large and geographically compact to constitute a majority in a single member district...." *Thornburg v. Gingles*, 478 U.S. at 50, 106 S.Ct. at 2766. Appellants insist that this requires the creation of districts with 65% minority populations. The Commission's plan created four minority/majority districts ranging from 60%

14. The Third Senatorial District is currently represented by Senator Roxanne H. Jones, the Seventh Senatorial District is currently represented by Senator Chakah Fattah, and the Eighth Senatorial District is currently represented by Senator Hardy Williams. 110 Pa. Manual 95–96 (1991). None of the present incumbents have joined in the instant attack upon the Commission's plan, nor have they evinced in any way their concurrence in the alleged concerns.

to 62% of minority population (56% to 58% voting age population). There is no requirement under Federal law for a 60% to 65% minority population; indeed in *Mississippi Republican Executive Committee v. Owen H. Brooks, et al.*, 469 U.S. 1002, 105 S.Ct. 416, 83 L.Ed.2d 343 (Memorandum Opinion), *aff'g Jordan v. Winter*, 604 F.Supp. 807 (N.D.Miss.1984), the Supreme Court of the United States affirmed the reapportionment plan of the United States District Court for the Northern District of Mississippi which created a second minority district with a majority of 52.8% black voting age population.[15] Here the Commission's final plan provides for four (4) minority/majority senatorial districts in Philadelphia, ranging in Black voting age population percentages from 56% to 58%. The Philadelphia Senatorial Delegation under the new plan would consist of seven (7) Senators, three (3) of whom also represent areas from counties surrounding Philadelphia county. Clearly the Commission has attempted to increase minority representation by creating four (4) minority/majority senate seats in Philadelphia whereas the prior plan included only three (3) minority/majority seats.

One of the intents of Congress in its passage of the Voting Rights Act and its subsequent amendments was incorporating minority voters into the entire political process. *See Thornburg v. Gingles*, 478 U.S. at 36–38, 106 S.Ct. at 2758–60. This intent can best be served by having the greatest number of minority/majority districts possible. The statutory language prescribing minority participation in the political process is maximized when there are more and

15. The 65% figure has been used by the Department of Justice as a benchmark for preclearance procedures when a state submits its reapportionment plan to the Department of Justice for approval. *United Jewish Organizations, Inc. v. Carey*, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977); *Bybicki v. State Board of Elections of Illinois*, 574 F.Supp. 1147, 1149 n. 4 (N.D.Ill.1983). However, this 65% benchmark has never been required by the courts, particularly in a district or state which has not been the subject of a determination by the Attorney General under 42 U.S.C. § 1973(b) that tests or devices are maintained to deny or abridge the right to vote based upon racial considerations. Therefore, there is no reason nor authority for this Court to recognize this benchmark in the present appeal.

not fewer opportunities for minorities to elect representatives of their choice.[16] While in this instance both plans could provide four senate seats in minority/majority districts, the plan adopted by the Commission provides for the optimum distribution of the Black population in a manner that would support electing or influencing additional representatives of their choice.

The 1991 plan, which creates an additional minority/majority senatorial district is based on the assumption that minority/majority district requirements are satisfied where the Black voting age population is maintained between 58% and 56%. The plan provides for Senate District No. 3 which will have a Black population of 60.63% and a Black voting age population of 58%; Senate District No. 4 which will have a 61.52% Black population and a Black voting age population of 58%; Senate District No. 7 with a Black population of 61.81% and a Black voting age population of 58%; and finally Senate District No. 8 with a Black population of 60.14% and a Black voting age population of 56%. Thus the ultimate result is that Blacks voters would have the opportunity to enjoy majority status in four (4) of the seven (7) Philadelphia senatorial districts. This result clearly fits within the intent of the Voting Rights Act.

Appellant Loeper also argues that the Commission failed to create a minority influence senate seat in Pittsburgh. A minority influence claim is one "brought by a minority group, not sufficiently large and compact to constitute a majority in a single-member district and thereby *elect* the candidate of their choice, but sufficiently large and geographically cohesive to *influence* elections." *Thornburg v. Gingles,* 478 U.S. 30, 46 n. 12, 106 S.Ct. 2752, 2764 n. 12, 92 L.Ed.2d 25 (1986). *See Chisom v. Roemer,* 501 U.S. ——, —— n. 24, 111 S.Ct. 2354, 2365 n. 24, 115 L.Ed.2d 348, 364

**16.** The inability of Blacks historically to exercise the right to vote granted by the Fifteenth Amendment was not the result of apathy, but rather from the Black voters' inability to overcome barriers set up by hostile Whites which included poll taxes, literacy tests, intimidation, violence and other schemes more subtle to discourage their participation.

n. 24 (1991); *McNeil v. Springfield Park District,* 851 F.2d 937, 947 (7th Cir.1988), *cert. denied,* 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989). This claim has been raised in the federal courts and consistently denied as neither constitutionally nor statutorily required. *See, e.g., Chisom, supra; McNeil, supra; but see, Armour v. State of Ohio,* 775 F.Supp. 1044 (N.D.Ohio 1991).[17] This Court, limited in its review of the plan to the constitutional and statutory requirements, is provided no authority to ascertain the appropriate population percentages for the creation of minority influence districts.[18]

## DISCOVERY

The final request of various appellants is for this Court to Compel Discovery of the underlying motives and purposes of the Commission members and its staff. The Commission raises legislative immunity in its response to Appellants' discovery requests. We need not resolve this issue because we have already held that the plan on its face does not violate the Constitution of Pennsylvania, the Constitution of the United States, or the Voting Rights Act. Therefore any evidence of the motives or discussions of the Commission or its staff is irrelevant and those requests are denied.

17. The present appeal is clearly distinguishable from the facts and holding of the *Armour* decision. In *Armour,* the three-judge panel of the District Court found that there was historical and intentional discrimination violating the Voting Rights Act, the Fifteenth Amendment to the United States Constitution, and the Constitution of Ohio. 775 F.Supp. at 1061. It is also noteworthy that the relief ordered by the court in *Armour* resulted in a minority influence district constituting "nearly one-third of the voting age population." *Id.* at 1059. In this case, the minority population of the 38th Senatorial District is greater than 34%.

18. It should be noted that the final plan does contain the 38th Senatorial District in Allegheny County with 34% African–American population. Without establishing any criteria for minority influence districts, this Court would note that it would appear that 34% of the population of a district would provide the minority an opportunity to influence the outcome of elections. *See Chisom v. Roemer,* 501 U.S. at —— n. 24, 111 S.Ct. at 2365 n. 24, 115 L.Ed.2d at 364 n. 24.

## CONCLUSION

Accordingly, the final plan of the 1991 Legislative Reapportionment Commission for the Pennsylvania Senate and House of Representatives complies with all constitutional and statutory requirements, and shall be used hereafter in elections to the General Assembly until the next Reapportionment is constitutionally required.

LARSEN, J., did not participate in the consideration or decision of these cases.

FLAHERTY, J., did not participate in the consideration or decision of Nos. 190, 194, 196, 199 and 201 E.D. Misc. Dkt. 1991; Nos. 49 and 51 M.D. Misc. Dkt. 1991; and No. 138 W.D. Misc. Dkt. 1991.

PAPADAKOS, J., did not participate in the consideration or decision of Nos. 190, 194, 196, 199 and 201 E.D. Misc. Dkt. 1991; Nos. 49 and 51 M.D. Misc. Dkt. 1991; and No. 138 W.D. Misc. Dkt. 1991.