**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**BAER, C.J., TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | | |
|---|---|---|
| IN RE: NOMINATION PETITION OF ROBERT JORDAN AS REPUBLICAN CANDIDATE FOR STATE REPRESENTATIVE FROM THE 165TH LEGISLATIVE DISTRICT | : : : : : : : : : | No. 56 MAP 2022<br><br>Appeal from the Order of the Commonwealth Court at No. 187 MD 2022 dated April 11, 2022.<br><br>SUBMITTED: April 16, 2022 |
| APPEAL OF: FRED RUNGE, | : : | |
| Objector | : | |

**OPINION**

**JUSTICE WECHT**

**DECIDED: April 19, 2022**
**OPINION FILED: July 20, 2022**

This matter began with a challenge to the nomination petition of Robert Jordan, a candidate for the Republican Party's nomination for the office of State Representative of the 165th Legislative District. Fred Runge ("Objector") sought removal of Jordan's name from the ballot for the May 17, 2022 primary election on the ground that Jordan had moved into the district less than a year before the November 8 general election and therefore could not satisfy the residency requirements set forth in Article II, Section 5 of the Pennsylvania Constitution.[1] The Commonwealth Court found Objector's claim non-

---

[1] Article II, Section 5 provides:

Senators shall be at least 25 years of age and Representatives 21 years of age. They shall have been citizens and inhabitants of the State four years, and inhabitants of their respective districts one year next before their election (unless absent on the public business of the United States or of this

justiciable and dismissed his challenge for lack of subject matter jurisdiction. Given the need to resolve the appeal expeditiously to provide notice to the parties and election administrators, we reversed the lower court's decision in a *per curiam* Order dated April 19.[2] We also directed the Secretary of the Commonwealth to remove Jordan's name from the ballot, finding by a preponderance of the evidence that Jordan will not have been an inhabitant of the 165th Legislative District for at least one year preceding the general election. This opinion explains our ruling.

## I.

The pertinent facts are not in dispute.[3] Beginning in April 2020, Jordan resided and was registered to vote in Broomall, a census-designated place in Marple Township, Delaware County. Jordan's Broomall residence was located in what was then House District 165 ("Old HD-165").[4] Before November 8, 2021, Jordan signed an agreement for the purchase and construction of a new home in Swarthmore Borough, then situated in Old HD-161. The new home was certified for occupancy on February 7, 2022, and the parties stipulated that Jordan moved into the residence between that date and March 16,

_____

State), and shall reside in their respective districts during their terms of service.

PA. CONST. art. II, § 5.

[2] *Nomination Petition of Jordan,* 56 MAP 2022, 2022 WL 1159469, *1 (Pa. Apr. 19, 2022) (*per curiam*).

[3] *See* Objector's Br., Ex. B (Joint Stipulation of the Parties, ¶¶ 1-16).

[4] For ease of reference, we differentiate between the legislative districts that took effect this year and their previous iterations by designating them "New" or "Old," respectively.

the date that this Court resolved all challenges to the 2021 Legislative Reapportionment Commission's Final Plan.[5]  Both dates are significant because, with the implementation of the Final Plan, Swarthmore's district changed from Old HD-161 to New HD-165, so Jordan was not a resident of either the former or present incarnation of HD-165 for a period of time earlier this year.[6]

Jordan timely filed a nomination petition seeking the Republican Party's nomination to represent New HD-165, in which he identified his Swarthmore address as his residence.  In completing the required form affidavit that he attached to his petition, Jordan placed an asterisk after the portion of the affidavit that requires a candidate to confirm his or her eligibility for office, and added a handwritten citation, without additional explanation, to footnote seven of this Court's decision in *In re 1991 Pennsylvania Legislative Reapportionment Commission*, 609 A.2d 132 (Pa. 1992) ("*1991 LRC*").  In that footnote, this Court identified but did not decide the following wholly speculative issue that might arise as a consequence of some future redistricting process:

> Appellant [candidate] raises a residency issue as well in his appeal from the final plan, and alleges that it will be impossible for an incumbent senator to have resided in his district for a year before the election, and for all four years of his tenure (as mandated by the Constitution) if the Senatorial Districts are altered by the Reapportionment Commission.  This issue is not yet ripe for review because no senator has suffered adverse consequences in the form of losing a seat for failure to satisfy the residency requirement.  However, we would note that the constitutional residency requirements may conflict with the constitutional mandate of reapportioning the Commonwealth every ten years.  In light of that conflict, it may be necessary that residency requirements be waived when the Commission reapportions the Commonwealth less than one year before an election.  These issues

---

[5]    *See* Order, *In re 2021 Pa. Legislative Reapportionment Comm'n*, 4 WM 2022 (Pa. Mar. 16, 2022) (*per curiam*).

[6]    As a result of this year's decennial redistricting, Jordan's former residence in Broomall now is in New HD-166.

and possible resolutions are for the Senate to decide. . . . This Court will reserve ruling on this issue until such time that a particular party suffers injury at which point we will address the apparent conflict between the constitutional provisions.

*Id.* at 139 n.7.

Objector timely challenged Jordan's nomination petition on two grounds. First, Objector asserted that Jordan constitutionally was ineligible to run for State Representative because Jordan will not have resided in New HD-165 for at least one year preceding the November 2022 general election. Second, Objector argued that Jordan improperly rendered his statement of eligibility conditional in nature by adding the asterisk and citation.

For his part, Jordan acknowledged that he moved to Swarthmore less than a year before the November election, but he emphasized that his previous residence in Broomall was within *Old* HD-165 and that his current residence in Swarthmore is in *New* HD-165. Because redistricting occurred less than a year before Election Day, he argued, it would be impossible for him or anyone else to have resided in New HD-165 in its present configuration for one year in advance of the election. As for his amendment to the affidavit, Jordan explained that he simply was clarifying the grounds for his eligibility by citing authority that he believed justified a waiver of the one-year residency requirement when the legislative redistricting process becomes final less than a year before a general election.

The Honorable Christine Fizzano Cannon heard the parties' arguments on April 7, 2022, when they stipulated to the foregoing facts. In a memorandum opinion, Judge Fizzano Cannon concluded that the court lacked jurisdiction to consider Objector's residency challenge because his claim was non-justiciable.

Judge Fizzano Cannon first identified a distinction between this case and "those in which objectors have challenged candidates' affidavits as stating false addresses." Mem. Op., 4/11/2022, 187 M.D. 2022, slip op. at 4. The court explained that "[s]tating one's current address in a candidate's affidavit is a statutory requirement under Section 910 of the Pennsylvania Election Code, 25 P.S. § 2870(a), not a constitutional mandate. Where objectors challenge as false the statutorily required assertions in candidates' affidavits, courts have jurisdiction under the Election Code to consider such challenges." Slip op. at 5 (cleaned up). But Objector did not challenge the veracity of Jordan's stipulated residence. Rather, Objector alleged that Jordan did not satisfy the one-year residency requirement and therefore constitutionally was ineligible to run for the state House. Given that distinction, the court *sua sponte* considered whether it had jurisdiction to hear Objector's particular challenge.

The court relied heavily upon the expressions of a plurality of Justices[7] in *Nomination Petition of Jones*, 476 A.2d 1287 (Pa. 1984), which involved a similar one-year residency challenge brought against a candidate for the Democratic Party's nomination for state Senate from Philadelphia. In *Jones*, the Court considered "whether or not Article II, Section 5 dictates that a court should make an *a priori* determination of whether a candidate meets the constitutional requirements for the office she seeks to obtain and on the basis of that judgment deny the candidate the right to put her name before the public for consideration." *Id.* at 1290. Central to the plurality's analysis was

---

[7] Chief Justice Nix authored the plurality opinion, which was joined by Justices Zappala and Papadakos. Justice Flaherty concurred in the result, and Justice Larsen did not participate in the consideration or decision of the case. Justices McDermott and Hutchinson dissented separately, and also joined each other's respective opinion.

its characterization of the residency challenge at issue as one relying "solely on Article II, Section 5 as the predicate for . . . jurisdiction." *Id.* at 1293. As such, the plurality regarded the "unstated premise" of the challengers' argument to be that Article II, Section 5 "is self-executing," putatively a precondition to "authoriz[ing] court involvement." *Id.* at 1290.

Rejecting that premise, the plurality observed that "Article II, Section 5 does not by its terms grant jurisdiction to the courts to inquire into the qualifications of one seeking to run for the office." *Id.* at 1293.

> Article II is concerned with the composition, powers and duties of the legislature. Nothing in this article even remotely suggests the conference of jurisdiction upon the courts to test the qualifications of the members of the General Assembly. Indeed, [Article II, Section 9] expressly states that each body of the General Assembly shall be the judge of the qualifications of its members.[8] Moreover, Article II, Section 5 by its express terms refers only to the qualifications of the *members* of the body. There is no reference to persons who file to run for office.

*Id.* at 1290-91 (emphasis in original). As the general power "to regulate the election process is vested in the legislature," it was up to the legislative branch to "expressly . . . confer" the power to adjudicate the constitutional qualifications of candidates to the judicial branch—or, correlatively, to *not* do so. *Id.* at 1293; *see id.* ("The courts have been granted limited (not plenary) authority by the legislature over the election process."). The plurality concluded that the absence of an express conferral of such authority was fatal to the challengers' efforts. *See id.* at 1293-94 ("Because our jurisdiction in th[is] area flows from statute rather than common law, it cannot be extended by implication beyond the prescription of the act from which it originates. . . . Absent an identification of the specific

---

8 Article II, Section 9 provides, in relevant part: "Each House shall choose its other officers, and shall judge of the election and qualifications of its members." PA. CONST. art. II, § 9.

statutory authority from which jurisdiction arises, the courts are powerless to intervene." (citations omitted)).

Apart from what it perceived as the "obvious conclusion that Article II was not designed to confer judicial power," *id.* at 1291, the plurality further reasoned that its determination necessarily "flow[ed] from the concept of the separation of powers." *Id.* at 1292 (citing *Baker v. Carr*, 369 U.S. 186, 210 (1962)); *see id.* ("The vesting of authority to pass upon the qualifications of [elected] prospective legislators in the legislative body is deemed an essential concomitant of our tripartite form of government affording to the legislative branch an independent requisite to its successful functioning." (quoting *Harrington v. Carroll*, 239 A.2d 437, 443 (Pa. 1968) (Jones, J., concurring))). This "proper relationship between the various branches of our government" was "embraced by the people of this Commonwealth and set forth in [Article II,] Section 9 in clear and unequivocal terms." *Id.* The plurality further cited a number of cases from other jurisdictions for the proposition "that the language used in [Article II, S]ection 9 is properly interpreted as placing the exclusive jurisdiction in the legislative body and divesting the courts of all jurisdiction in the matter." *Id.* at 1291.

Despite these broad pronouncements, though, the plurality cautioned that its non-justiciability rule should not "be construed as an absolute prohibition against judicial consideration of the constitutional qualifications of one claiming an office." *Id.* at 1292. The plurality offered two specific exceptions. First, "[m]anifestly, the court has jurisdiction to entertain a claim of an elected prospective office holder that his or her right to sit has been unconstitutionally denied." *Id.* (citing *Powell v. McCormack*, 395 U.S. 486 (1969)).

> [Judicial] intervention in that situation does not flow from the constitutional
> section setting forth the qualifications, but rather from our well recognized

> jurisdiction to intervene when there is an allegation of an infringement of constitutional rights. The consideration of the qualifications as set forth by the constitutional mandate is merely tangential to the underlying inquiry.

*Id.* (citations omitted). And second, "the judicial remedy of *quo warranto*" remains "available to test an individual's right to hold a public office" to which he or she has been elected. *Id.* (citing *Spykerman v. Levy*, 421 A.2d 641 (Pa. 1980)); *see id.* ("Here again the court is not directly involved in evaluating constitutional qualifications, but rather in preserving the integrity of our public institutions.").

In the principal dissenting opinion, Justice Hutchinson first disputed the plurality's suggestion that the objectors relied "solely" upon Article II, Section 5 to invoke the jurisdiction of the courts. In fact, the objectors asserted that the Commonwealth Court "has original jurisdiction of this Petition pursuant to . . . [Section] 977 of the Pennsylvania Election Code," and that the candidate violated the same—*as well as* the Constitution— "in swearing falsely in her Candidate's Affidavit . . . as to the location of her residence at the time she signed" the affidavit. *Jones*, 476 A.2d at 1299 (Hutchinson, J., dissenting) (quoting Petition to Set Aside, ¶¶ 1, 8). The dissent contended that the General Assembly specifically granted the courts jurisdiction to consider constitutional eligibility challenges via Section 977, which commands that, "if the court shall find that said nomination petition or paper . . . was not filed by persons entitled to file the same, it shall be set aside." 25 P.S. § 2937. "[W]hether a candidate can meet [the] constitutional qualifications for office is justiciable on timely objection to his nomination petition" pursuant to that *statutory* provision. *Jones*, 476 A.2d at 1298 (Hutchinson, J., dissenting).

Fundamentally, "[a] person who cannot serve is not entitled to file." *Id.* at 1299. "This is the obvious reason why Section 910 [of the Election Code[9]] requires a candidate to state in his affidavit that he is 'eligible' for the office he seeks." *Id.* Under that provision, "the candidate's affidavit is a necessary part of her nomination petition." *Id.* "[B]y pleading the falsity of the affidavit . . . with respect to residency," the objectors invoked the authority of the courts to adjudicate candidacy challenges under Section 977. *Id.* at 1300.

Justice Hutchinson also offered a lengthy response to the plurality's non-justiciability analysis, explaining that none of the factors identified by the United States Supreme Court in *Baker v. Carr* or *Powell v. McCormack* to determine whether a case presents a non-justiciable political question were present in *Jones*. *See id.* at 1300-03. Of particular note, the dissent posited that Article II, Section 9 "is not a textually demonstrable constitutional commitment of the issue of a '*candidate's*' constitutional qualifications to the legislature; it is only a textual commitment of authority for the legislature to determine qualifications of its '*members*.'" *Id.* at 1301 (citing *Nomination Papers of Carlson*, 430 A.2d 1210 (Pa. Cmwlth. 1981)) (emphasis added). And in promulgating the Election Code, the General Assembly "prescribed a complete framework for the judiciary to follow in entertaining such challenges." *Id.* at 1302. Pennsylvania courts "are quite capable of resolving factual questions such as whether a

---

[9]    *See* 25 P.S. § 2870 ("Affidavits of candidates") ("Each candidate for any State, county, city, borough, incorporated town, township, ward, school district, poor district, election district, party office, party delegate or alternate, or for the office of United States Senator or Representative in Congress, shall file with his nomination petition his affidavit stating," *inter alia*, "(d) that he is eligible for such office . . . .").

candidate meets the age and residency requirements of our Constitution without an initial policy determination of any sort." *Id.*[10]

Lastly, Justice Hutchinson criticized the plurality's invocation of the writ of *quo warranto* and judicial review of a chamber's refusal to seat a duly elected member under Article II, Section 9 as sufficient *post hoc* remedies for challenging a person's constitutional eligibility to hold office. He regarded the discussion as an "unnecessary attempt to deal with jurisdiction and justiciability of issues surrounding the seating or expulsion of *elected* candidates," which was not the question before the Court. *Id.* at 1302-03.

> None of the cases cited in the opinion in support of the Court's orders holds justiciable the issue of whether an elected candidate, unlike one seeking to run, should be refused his seat for failure to meet constitutional qualifications.

> The dictum, implying that the judiciary would be less "directly involved in evaluating constitutional qualifications" if it were to review the Senate's decision on a post-election seating contest than if it were to vacate an unqualified candidate's nomination petition under the express provisions of the Election Code, is incomprehensible to me. The consideration of the candidate's qualifications in the seating case is no more "tangential" to judicial decision than in the Election Code case.

*Id.* at 1303 (quoting 476 A.2d at 1293 (plurality)). Contrary to the plurality's suggestion that the General Assembly did not authorize judicial review of these sorts of qualification contests, the dissent found in Section 977 the Legislature's "direct[ive to] the judiciary . . . to preserve the integrity of elections by vacating nomination petitions filed by candidates who falsely swear they meet constitutional requirements to serve." *Id.*

---

[10] The dissent also found the decisional law from other jurisdictions cited by the plurality to be largely irrelevant to that dispute, given that all but one of those cases "deal[t] with post-general election challenges under an election code," and none involved pre-primary eligibility disputes. *Jones*, 476 A.2d at 1302 (Hutchinson, J., dissenting).

In response, the plurality insisted that the objectors "did not seek to bring the Article II, Section 5 argument within the purview of Section 977," *id.* at 1295, which is the "sole and exclusive remedy for challenging a person's right to run for political office in Pennsylvania." *Id.* at 1294. Rather, the objectors "clear[ly] impli[ed]" that the constitutional provision "itself conferred jurisdiction." *Id.* at 1295. But even if the objectors had couched their claim squarely in statutory terms, the plurality still would have denied relief. Deriding what it considered an "attempt[ ] to change the issue to that of false swearing" in the candidate's affidavit, the plurality rejected Justice Hutchinson's assumption that Section 977's use of the phrase "entitled to file the same" somehow "incorporates" Section 910's requirement that a candidate aver "that he is eligible to run for office." *Id.*

> The dissent . . . premises its argument upon the bald statement "A person who cannot serve is not entitled to file." It is most significant that in spite of that dissent's liberal use of citations generally, not one case, not a scintilla of authority nor a prior decision is set forth to support this premise. To the contrary, it does not necessarily follow that the legislature intended to use the election process as a device to screen against every possible impediment to holding office.

*Id.* (quoting 476 A.2d at 1295 (Hutchinson, J. dissenting)).

Less than a year after *Jones* was decided—perhaps in response to this Court's inability to reach a consensus—the General Assembly amended Section 910 of the Election Code to require the following:

> In cases of petitions for candidates for the General Assembly, the candidate's affidavit shall state (1) that the candidate will satisfy the eligibility requirements contained in Sections 5 and 7[11] of Article II of the

---

11    Article II, Section 7 ("Ineligibility by criminal convictions") states: "No person hereafter convicted of embezzlement of public moneys, bribery, perjury or other infamous crime, shall be eligible to the General Assembly, or capable of holding any office of trust or profit in this Commonwealth." PA. CONST. art. II, § 7.

Constitution of Pennsylvania [and] . . . (3) that the candidate shall have been a citizen and inhabitant of Pennsylvania four (4) years and an inhabitant of the respective district one (1) year next before the election (unless absent on the public business of the United States or of this State). . . .

*Nomination Petition of Street*, 516 A.2d 791, 792-93 (Pa. Cmwlth. 1986) (quoting Section 3 of the Act of Apr. 18, 1985, P.L. 5, No. 4 ("Act 4")).  The Legislature likewise amended Section 977 to require a reviewing court to set aside a nomination petition if it found that "any accompanying or appended affidavit . . . contains a material defect or error . . . .  For purposes of this section, a nomination petition or paper shall include all affidavits required to be filed with such nomination petition or paper under this Act."  *Id.* at 793 (quoting Section 5 of Act 4).

Street involved a one-year residency challenge to a prospective Democratic nominee for a seat in the state House.  In rejecting the candidate's non-justiciability defense, the Commonwealth Court explained that the Act 4 amendments addressed the "deficiency" of judicial power proposed by the *Jones* plurality, such that challenges to a candidate's qualifications no longer concern "an *a priori* inquiry," but now speak directly to "the veracity of statements contained in the affidavit of a candidate."  *Id.* at 792.  This Court unanimously adopted the *Street* court's holding in *Nomination Petition of Prendergast*, 673 A.2d 324, 325 (Pa. 1996), concluding that the residency challenge before it was justiciable.[12]  *Cf. Nomination Petition of Hughes*, 532 A.2d 298, 303 n.5 (Pa. 1987) (noting that *Jones* was "a plurality opinion of this Court which has no precedential value . . . [and] established no controlling precedent").

---

[12]     Then-Justice Castille concurred in the result.

Two years after *Prendergast*, the General Assembly amended the Election Code yet again. In Act 18 of 1998, the political branches "remove[d] the amendments to Sections 910 and 977 . . . that were added by Act 4 of 1985." *Nomination Petition of Pippy*, 711 A.2d 1048, 1054 (Pa. Cmwlth. 1998); *see generally id.* at 1051-55 (tracing the evolution of pertinent Election Code provisions). Highlighting this reversion, the candidate whose qualifications were challenged in *Pippy* asserted that the courts had been divested of jurisdiction to hear those claims. The Commonwealth Court disagreed, noting that Section 910 "still requires a candidate seeking a seat in the Pennsylvania House of Representatives to execute a candidate's affidavit in which he swears or affirms 'that he is eligible for such office', and to file the affidavit with his nomination petition." *Id.* at 1054 (quoting 25 P.S. § 2870). Although the court did not cite Justice Hutchinson's dissent in *Jones*, it essentially adopted his rationale, explaining that, "[b]y incorporating the provisions of Section 976, Section 977 still requires this court to set aside the nomination petition of a candidate if we determine that it is defective because 'it contains material errors or defects apparent on the face thereof, or on the face of the appended or accompanying affidavits.'" *Id.* (quoting 25 P.S. §§ 2936, 2937).[13] This Court affirmed *per curiam* without addressing or endorsing the lower court's analysis. *Nomination Petition of Pippy*, 709 A.2d 905 (Pa. 1998) (*per curiam*).

---

[13] *See also Pippy*, 711 A.2d at 1055 (observing that "Section 1802.1 [of the Election Code] still states, in pertinent part, that '[a]ny candidate for State . . . office who knowingly makes a false statement regarding his eligibility or qualifications for such office in his candidate's affidavit shall, in litigation which results in the removal of the candidate from the ballot, be liable for court costs, including filing fees, attorney fees, investigation fees and similar costs' 25 P.S. § 3502.1") (emphasis removed).

Adopting the non-justiciability position in this case, Judge Fizzano Cannon reasoned that *Prendergast* and *Street* relied on statutory provisions that no longer exist, and she found that *Pippy* "irreconcilably conflicts" with the *Jones* plurality. *Jordan*, slip op. at 9, 16. The court explained that neither a plurality decision from this Court, nor "reported single-judge opinions filed [by the Commonwealth Court before] October 1, 2013 in election matters," constitute binding precedent. *Id.* (citing *Commonwealth v. Pelzer*, 222 A.3d 368, 369 (Pa. 2019); 210 Pa. Code § 69.414(d)). With respect to our *per curiam* affirmance of *Pippy*, the Commonwealth Court quoted at length our decision in *Commonwealth v. Tilghman*, 673 A.2d 898 (Pa. 1996), which explained that, "[u]nless we indicate that the *opinion* of the lower tribunal is affirmed *per curiam*, our order is not to be interpreted as adopting the rationale employed by the lower tribunal in reaching its final disposition." *Id.* at 904 (emphasis added). Consequently, the Commonwealth Court's reasoning in *Pippy* did not bind Judge Fizzano Cannon or the Commonwealth Court at large. *Jordan*, slip op. at 10-11.

In effect, the Commonwealth Court, finding no controlling authority, considered the *Jones* plurality's separation-of-powers analysis more persuasive than the *Pippy* court's reasoning. Echoing the *Jones* plurality's rejection of efforts to establish jurisdiction by couching the challenge as a claim of false swearing, Judge Fizzano Cannon explained that a viable residency challenge under Section 977 essentially must identify a false statement of fact—*e.g.*, that the candidate listed a false address on his or her affidavit. Assertions of law, such as constitutional ineligibility, are beyond the scope of Section 977. *Id.* at 14; *see, e.g.*, *id.* at 15 (citing *Nomination Petition of Shimkus*, 946 A.2d 139

(Pa. Cmwlth. 2008); *id.* at 16 (citing *Nomination Petition of Makhija*, 136 A.3d 539 (Pa. Cmwlth. 2016)).

Notably, Judge Fizzano Cannon excepted from this broad holding candidacy challenges predicated upon Article II, Section 7, which prohibits individuals convicted of certain crimes from being "eligible to the General Assembly, or capable of holding any office of trust or profit in this Commonwealth." *Id.* at 17; *see* n.11, *supra*. By way of example, Judge Fizzano Cannon noted her own single-judge opinion in *Nomination Petition of Bolus*, 251 A.3d 848 (Pa. Cmwlth. 2021), in which she concluded that a statement in a mayoral candidate's affidavit that he was "eligible" for the office he sought was "both false and contrary to the proscription of Article II, Section 7." *Jones*, slip op. at 17 (citing *Bolus*, 251 A.3d at 854-55). Because that provision relates to "ineligibility," rather than "qualifications," Judge Fizzano Cannon reasoned that the two scenarios were distinguishable. *Id.* "Moreover, in *Bolus*, the putative candidate for office had previously been judicially determined, in a separate declaratory judgment action initiated by the candidate himself, to be 'incapable of holding any office in this Commonwealth' because of his multiple criminal convictions." *Id.* at 17-18 (quoting *Bolus v. Fisher*, 785 A.2d 174, 178 (Pa. Cmwlth. 2002)). Given Bolus' repeated failure "to withstand challenges to his nomination petitions on the same basis in multiple previous elections," it was "'inconceivable that [he] made an honest mistake when he executed candidate's affidavits . . . swearing that he is eligible" to serve as mayor. *Id.* at 18 (quoting *Bolus*, 251 A.3d at 855). Here, by contrast, Objector raised no similar allegations that Jordan swore a false statement of fact. "[D]espite Objector's attempts to cast his argument in

terms of a false affidavit, the issue raised by Objector in this case falls squarely within the ambit of the Legislature, not the courts." *Id.*

Having adopted the *Jones* plurality's non-justiciability rule, Judge Fizzano Cannon dismissed Objector's residency challenge for lack of subject matter jurisdiction. *See id.* at 11, 14. She also concluded that the handwritten footnote that Jordan added to his petition did not render his attestation conditional, but simply "explain[ed] the basis for [his] legal argument concerning his eligibility." *Id.* at 18-19. Objector appealed, and we reversed by *per curiam* Order for the following reasons.

## II.

On appeal from an order determining the validity of a challenge to a nomination petition, this Court will only reverse the lower court if its "findings of fact are not supported by substantial evidence in the record, there was an abuse of discretion, or there was an error of law." *Nomination Petition of Driscoll*, 847 A.2d 44, 49 (Pa. 2004). Here, however, the lower court did not reach the merits of Objector's challenge. Instead, the court determined that it could not consider the claim, a determination that turned upon its conclusion that questions concerning justiciability—namely under the political question doctrine—implicate a court's subject matter jurisdiction.

Ordinarily, courts may review threshold issues of jurisdiction *de novo*—and, if need be, *sua sponte*. *Fried v. Fried*, 501 A.2d, 211, 212 (Pa. 1985). But there is a tension between the federal courts' treatment of political questions and our own. Although justiciability and jurisdiction, broadly speaking, are distinct principles, the Supreme Court of the United States has consistently regarded political questions as beyond the federal judiciary's jurisdiction under the case or controversy requirement of Article III of the United

States Constitution. *See Rucho v. Common Cause*, 139 S.Ct. 2484, 2493-94 (2019) ("In such a case the claim is said to present a 'political question' and to be nonjusticiable—outside the courts' competence and therefore beyond the courts' jurisdiction.") (citing *Baker*, 369 U.S. at 217).

Pennsylvania courts have been less consistent on the topic. Our seminal decisions involving the political question doctrine did not invoke "subject matter" jurisdiction as such, instead deriving non-justiciability "from the principle of separation of powers." *Zemprelli v. Daniels*, 436 A.2d 1165, 1168 (Pa. 1981). But when read in context, those cases suggested that the doctrine is inextricably intertwined with jurisdictional considerations. *See id.* at 1170 ("[T]he subject matter of the instant action suffers from none of the constitutional infirmities enumerated in *Baker v. Carr*, *supra*. Accordingly, we conclude that petitioners' claim is justiciable and we shall proceed to consider its merits."); *Sweeney v. Tucker*, 375 A.2d 698, 707-12 & nn.22, 23 (Pa. 1977) (agreeing with Justice Douglas' concurrence in *Powell v. McCormack* "that legislative exclusion and expulsion pose different problems in determining the propriety of judicial review," in that a legislature's decision to punish a sitting member with expulsion for misconduct may be non-justiciable, whereas courts are not necessarily "deprive[d] . . . of jurisdiction" to adjudicate claims alleging the unconstitutional exclusion of a member-elect for lack of qualifications); *see also Jones*, 476 A.2d at 1290-96 (repeatedly referring to the justiciability issue as a question of jurisdiction).

Decades later, though, we contrasted our approach to political questions with the federal approach, observing in general terms that "notions of case or controversy and justiciability in Pennsylvania have no constitutional predicate, do not involve a court's

jurisdiction, and are regarded instead as prudential concerns implicating courts' self-imposed limitations." *Robinson Twp. v. Commonwealth*, 83 A.3d 901, 917 (Pa. 2013). In *Fumo v. City of Philadelphia*, 972 A.2d 487 (Pa. 2009), for instance, we discussed the distinction federal courts draw between standing as a constitutional requirement under Article III of the federal Constitution, and standing as a prudential matter that "embodies judicially self-imposed limits on the exercise of federal jurisdiction." *Id.* at 500 n.5. By contrast, "in Pennsylvania, the issue of standing implicates prudential concerns," not constitutional ones. *Id.* And in *Rendell v. Pennsylvania State Ethics Commission*, 983 A.2d 708 (Pa. 2009), the Court rejected one Justice's assertion that certain prudential considerations, such as mootness, can be raised *sua sponte*, which that Justice likened to cases involving subject matter jurisdiction. The Court explained that, "under this Court's case-or-controversy jurisprudence as it stands, these concerns simply are not available for consideration at this time, since they have not been raised by any of the parties." *Id.* at 717 & n.9; *see generally William Penn Sch. Dist. v. Pa. Dep't of Educ.*, 170 A.3d 414 (Pa. 2017) (discussing justiciability and the political question doctrine). *But see Rendell*, 983 A.2d at 720 n.2 (Greenspan, J., concurring) (citing *Pa. R.R. Co. v. Pa. Pub. Util. Comm'n*, 152 A.2d 422, 424 (Pa. 1959), and other cases for the proposition that "[t]his Court has the authority to raise the issue of justiciability *sua sponte* where there is no case or controversy between the parties").

Whether courts abstain from considering political questions as non-justiciable for prudential reasons or because our constitutional design deprives them of jurisdiction to do so in furtherance of our tripartite form of government, the result is the same: courts may not reach the merits of the underlying claim. The court below, treating justiciability

as a jurisdictional matter, raised and considered justiciability even though the parties did not raise it. While we do not endorse that equivalency, our case law, and common sense, suggest that certain questions of justiciability go to the courts' competency to decide a case, especially where the constitutional separation of powers is implicated. Accordingly, because the lower court raised, and the parties now have briefed, the matter, we assume without deciding that a justiciability question arising from the political question doctrine may be raised by a court *sua sponte*—unlike other discrete justiciability doctrines, which, we have held, must be preserved and raised by the parties themselves. *See, e.g.*, *Rendell*, 983 A.2d at 717 (explaining that standing, ripeness, and mootness may not be raised by a court *sua sponte*) (citing *Nomination Petition of deYoung*, 903 A.2d 1164, 1168 (Pa. 2006)). "The decision as to whether a claim presents a non-justiciable political question is the responsibility of this Court as ultimate arbiter of the Constitution." *Zemprelli*, 436 A.2d at 1169. And as with subject matter jurisdiction, justiciability presents a question of law that we review *de novo*, subject to a plenary scope of review. *Robinson Twp.*, 83 A.3d at 917.

## A.

Only Objector presents a developed argument on justiciability, and it is succinct. Objector asserts that the Commonwealth Court erred in adopting the *Jones* plurality's non-justiciability rule and in dismissing his challenge for lack of subject matter jurisdiction. He contends that the court "misconstrued" *Jones* and "ignore[d] the next 35 years of history." Objector's Br. at 7. In Objector's view, *Jones* "was specifically repudiated by the General Assembly in 1985," and by the courts beginning the next year. *Id.* (citing *Street*, *Hughes*, and *Prendergast*). He disputes the meaning the lower court derived from the

1998 reversion to the *Jones*-era statutory regime, suggesting that the General Assembly simply recognized that "it was clear that the pre-*Jones* language allowed for residency and other qualifications for office challenges under the remaining 'eligible for office' provision." *Id.* at 8-9. Citing *Pippy*, *Bolus*, and other post-reversion Commonwealth Court decisions that arguably conflict with the *Jones* plurality, Objector posits that "[a] return to broad justiciability is the only way to square" the last twenty-four years' worth of decisional law. *Id.* at 9.

Jordan submitted a woefully deficient brief that "incorporates Judge Fizzano Cannon's reasoning and opinion as part of its argument." Jordan's Amended Br. at 2.[14] He does not address Objector's justiciability arguments or the lower court's analysis of that issue at all. Instead, he confines his arguments to the merits of Objector's challenge.

While one might reasonably prefer the *Jones* plurality's analysis, we find the dissenting reasoning of Justice Hutchinson more consistent with time-honored principles of constitutional governance. That view also finds firmer ground in the text of the Election Code. Section 977 of the Code provides robust authority for courts to consider the qualifications of potential *candidates* for elected office without infringing the General Assembly's constitutional prerogative "to judge of the election and qualifications of its *members*." PA. CONST. art. II, § 9 (emphasis added). That statutory provision instructs judges to "set aside" nomination petitions "not filed by persons entitled to file the same."

---

[14] We disapprove the practice of wholesale "incorporat[ion] by reference" as a substitute for developed argument. *Commonwealth v. Edmiston*, 634 A.2d 1078, 1092 n.3 (Pa. 1993); *see* Pa.R.A.P. 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part . . . the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent.").

25 P.S. § 2937. An individual who cannot meet the constitutional residency requirements, *see, e.g.*, PA. CONST. art. II, § 5, is not entitled to file a nomination petition. *Cf. Jones*, 476 A.2d at 1299 (Hutchinson, J., dissenting) ("A person who cannot serve is not entitled to file.").

Regardless whether Chief Justice Nix correctly posited that Article II, Section 5 is not "self-executing" and does not implicitly confer upon courts the authority to act absent statutory authorization, *see id.* at 1290 (plurality), our power emanates not from the constitutional text itself, but from our duty to effectuate what the Legislature has prescribed through the Election Code. The more harmonious reading of these statutory and constitutional provisions, then, is that "the General Assembly *has* entrusted to the judiciary *a priori* determination" of a candidate's constitutional qualifications for office, as sworn in his or her affidavit—assuming a challenger raises a timely challenge pursuant to the Code's requirements. *Id.* at 1300 (Hutchinson, J., dissenting) (emphasis added). It is true that the Constitution has given the Legislature authority over its members, but the Legislature has, in turn, empowered courts to resolve "factual questions such as whether a candidate meets the age and residency requirements of our Constitution." *Id.* at 1302. Setting aside the General Assembly's constitutional responsibility for questions of *membership*, *candidate* eligibility cannot lie outside the judiciary's purview if the Constitution and the Election Code are to be applied impartially and with fidelity to their terms.

The dissent looks to legislative history to glean the General Assembly's intent. Dissenting Op. (Brobson, J.) at 12. We do not dispute that some proponents of the bill that became Act 18 of 1998, citing the *Jones* plurality for inspiration, intended the

reversion to the *Jones*-era statutory language to strip the courts of "certain jurisdiction" to consider challenges to candidates' constitutional qualifications. Likewise, some who opposed the bill expressed concern that the change would invite selective enforcement of the Constitution's requirements. They speculated that the proposed elimination of judicial oversight would enable the party in control of a legislative chamber to exclude members of the minority for lack of necessary qualifications while ignoring similar meritorious challenges brought against members of the majority. *See* 1998 Pa. Legislative Journal—Senate, 1482-86 (Feb. 10, 1998); 1998 Pa. Legislative Journal—House, 242-86 (Feb. 11, 1998). But nothing in the amendment history of Section 977, much less its legislative history, shakes our view that the statute's plain language has always supported judicial review of challenges to candidates' constitutional qualifications for legislative office.

As is often the case, we can with diligent effort mine from some nook or cranny of the legislative record comments from individual legislators who either favored or feared the sponsor's purported intent behind the 1998 reversion. So, too, could we cite the legislative proceedings that arrived on the heels of *Jones*, in which the chief sponsor of the bill that became Act 4 of 1985 expressed the unrebutted view that the amendment merely "restates constitutional provisions as part of the law" and "further make[s] as part of the law a provision which most of us felt had previously existed, and that was that matters pertaining to a candidate's affidavit would be justiciable in the court system." 1985 Pa. Legislative Journal—Senate, 57 (Jan. 28, 1985) (remarks of Senator Stauffer).[15]

_____

[15] Act 4 was adopted by the Senate 47-1, and by the House 198-0. Even the Senate's lone dissenter agreed that the constitutional requirements were justiciable under

But we are bound by the statute's text, not by the to and fro of legislative floor debates. The governing text compels us to conclude that, whatever some may have intended, the General Assembly did not relieve the courts of jurisdiction over candidate qualification challenges through Act 18.

Before its revision by Act 4 in 1985, Section 977 provided a sufficient basis for Pennsylvania courts to adjudicate challenges to candidates' qualifications, and thus eligibility, on constitutional grounds. While Act 4 made those requirements more explicit for a time, the 1998 reversion simply restored the *status quo ante.* A candidate for the General Assembly, like all candidates for the offices enumerated in Section 910 of the Election Code, still must file an affidavit averring that he or she is eligible for that office. The veracity of that averment can be contested under Section 977, which still obliges a reviewing court to set aside the accompanying nomination paper or petition if it finds that the candidate was not entitled to file the same. None of that has changed. If the Legislature felt as strongly as some have suggested about denying our authority over these contests, it could have done more than leave us to derive that intention by inference from ancillary—and by no means dispositive—legislative sources.[16] Our authority to adjudicate such challenges is not so easily restrained.

_____

the *Jones*-era language, but he opposed the bill for other reasons. *See* 1985 Pa. Legislative Journal—Senate, 57 (Jan. 28, 1985) (remarks of Senator Williams) ("I assume that we always assumed that [constitutional requirements were] justiciable.").

[16]     In that vein, if the relevant provisions of the law had clearly and expressly manifested the General Assembly's intent to "remov[e] certain jurisdiction from the courts," as the dissent suggests, Dissenting Op. (Brobson, J.) at 12 (quoting H.B. 1760, title), there would be no need to resort to the bill's lengthy title to suss out its meaning. Per 1 Pa.C.S. § 1924, a title may inform, but does not control our interpretation— especially when the operative text is unambiguous.

Notably, Justice Hutchinson's dissenting view in *Jones* garnered plurality support nearly two decades earlier. *See Chalfin v. Specter*, 233 A.2d 562, 569 n.2 (Pa. 1967) (Roberts, J., concurring, joined by Jones and O'Brien, JJ.) (opining that Section 977 "is a clear legislative 'catch-all' designed precisely for attacks" predicated upon a candidate's ineligibility for elective office due to failure to meet residency requirements); *see also id.* (citing *Jaspan v. Osser*, 43 Pa. D. & C. 346 (Com. Pl. Phila. 1967), *appeal quashed*, East. Dist., Jan. Term, No. 393 (Pa. July 6, 1967), for the proposition that challenges under Section 977 are not limited to "technical defects in nomination papers and petitions which are patent on their face," but also may include "underlying defect[s], such as the ineligibility of a candidate" due to residency issues, which are not facially apparent). And given the historical practice of addressing qualification challenges emanating from Article II, Section 5, that view was at least implicit in even earlier decisions. *See In re Lesker*, 105 A.2d 376 (Pa. 1954) (adjudicating constitutional residency challenge); *cf. Case of Fry*, 71 Pa. 302, 307 (1872) ("The Constitution provides that senators and representatives shall be *inhabitants* of the *state*, the latter three and the former four years; and the last year, *inhabitants* of the *districts* from which they are chosen. . . . No one doubts that one domiciled in another state, but resident here for a special purpose of business or pleasure, is ineligible to election as a senator, representative, governor or judge.") (emphasis in original).[17]

---

[17]   We also find unpersuasive the distinction the lower court drew between questions about constitutional eligibility under Article II, Section 5, and questions of constitutional ineligibility for public office by reason of criminal conviction under Article II, Section 7, which Judge Fizzano Cannon maintains are justiciable. *See Bolus*, 251 A.3d 848. Courts can resolve eligibility challenges involving objective questions about a candidate's age and residency just as easily as those concerning one's criminal history. *See Jones*,

With these considerations in mind, we find that the question before us does not exhibit "one or more elements which identify it as essentially a function of the separation of powers." *Baker*, 369 U.S. at 710. We have not found in our organic Charter "a textually demonstrable constitutional commitment" of candidate qualification challenges to a coordinate political branch of our Commonwealth's government. *Id.* Pennsylvania courts do not lack "judicially discoverable or manageable standards for resolving" such challenges. *Id.* It is hardly "impossible" for judges to decide these kinds of cases "without an initial policy determination of a kind clearly for nonjudicial discretion," nor should there be any difficulty in "undertaking independent resolution without expressing lack of the respect due coordinate branches of government." *Id.* We see no "unusual need for unquestioning adherence to a political decision already made" in this context. *Id.* And we anticipate no likelihood of "embarrassment from multifarious pronouncements by various departments" on this question. *Id.*[18] Accordingly, channeling the *Jones*

_____

476 A.2d at 1302 (Hutchinson, J., dissenting) (extolling the judiciary's competency to resolve factual questions about "whether a candidate meets the age and residency requirements of our Constitution").

[18] Contesting some of these conclusions, the dissent cautions that our approach "opens the door" to potential conflicts with the General Assembly—that perhaps a court reviewing a residency challenge might come to a different conclusion than members of the House or Senate evaluating the same issue. Dissenting Op. (Brobson, J.) at 13. But the dissent overlooks the fact that the General Assembly has provided for something of a failsafe (or an end-around) in the event a candidate is excluded from the primary or general election ballot, erroneously or otherwise. Those individuals always may resort to write-in votes. *See Working Families Party v. Commonwealth*, 209 A.3d 270, 283 (Pa. 2019) (identifying write-in campaigns as means of circumventing anti-ballot-fusion provisions of the Election Code); *accord Appeal of Magazzu*, 49 A.2d 411, 412 (Pa. 1946). From its inception, the Election Code has permitted voters "at any primary or election" to "vote for any person for any office, for which his name does not appear" on the ballot, by writing in that person's name. *See* 25 P.S. § 3056(e); *accord id.* §§ 3031.12(a)(3)-(4), (b)(2)-(4); *id.* § 3055(b)-(c). The Code also prescribes the form that paper and electronic ballots must take, as well as requirements for voting machines, in

dissenters, we hold that nomination challenges predicated upon allegations that a candidate for the General Assembly cannot meet the qualification requirements set forth in Article II, Section 5 of the Pennsylvania Constitution are justiciable—not by dint of implicit constitutional authority standing alone, but per the implicit legislative prerogative embodied by Section 977 of the Election Code.

---

order to facilitate write-in voting. *See id.* § 2962 (official primary ballot); *id.* § 2963 (official election ballot); *id.* § 3007(d), (g) (voting machines); *id.* §§ 3146.3(b) (official absentee ballots), (d) (special write-in absentee ballots); *id.* §§ 3150.13(b) (official mail-in ballots), (d) (special write-in mail-in ballots). And the Code provides intricate procedures for how those votes are to be canvassed and tallied. *See id.* § 3031.13(b)-(f); *id.* § 3031.14(c); § 3062(c); *id.* § 3063(a); *id.* § 3155; *cf. id.* § 3156 (addressing "cumulation" of votes); *see generally Shambach v. Bickhart*, 845 A.2d 793 (Pa. 2004) (discussing various write-in provisions).

Unlike candidates who pursue general election ballot access by nomination petitions or papers, the Election Code does not require write-in candidates to file anything attesting to or substantiating their qualifications or eligibility for office. *Cf. Reuther v. Del. Cty Bureau of Elections*, 205 A.3d 302, 415-17 (Pa. 2019) (holding that the "fatal defect rule," which precludes candidates who fail to file statements of financial interest in accordance with Section 1104 of the Ethics Act, 65 Pa.C.S. § 1104(b)(3), from petitioning to appear on the ballot, does not apply to write-in candidates). Nor does it provide a mechanism for challenging the qualifications of victorious write-in candidates after their nomination or election. Except perhaps in the rare case in which *quo warranto* might lie, a circumstance that we have no occasion to explore today, once a write-in candidate is certified as the winner the courts are effectively powerless to interfere. At that point, in the case of allegedly unqualified members-elect of the Pennsylvania House or Senate, redress lies with those chambers, whose judgments we have no cause to review, save for the limited constitutional purposes sanctioned by the High Court in *Powell*. Thus, in finding the species of challenge at issue to be justiciable, we by no means suggest that the courts have the final word on who may hold elective office. That power ultimately rests with the people. And although we conclude that the people, through their elected representatives, have statutorily authorized the judiciary to "cull the herd" (so to speak) of ineligible candidates in the first instance when challenges are timely raised, Dissenting Op. (Brobson, J.) at 13, if the General Assembly disagrees with our construction of the Election Code in this regard, it may explicitly limit the courts' jurisdiction to entertain candidate challenges on these grounds going forward, as is its constitutional prerogative. *See* PA. CONST. art. V, § 10(c).

**B.**

Having dismissed the case for want of justiciability, Judge Fizzano Cannon did not reach the merits of Objector's residency challenge. But, as noted, we find that her conclusion in that regard was erroneous, leaving only the merits to resolve. While we could have remanded for further consideration, we declined to do so because time was of the essence and the record was clear enough that we could resolve the parties' dispute directly. Objector contends that Jordan's nomination petition must be set aside because, undisputedly, he has not resided within the boundaries of New HD-165 continuously since at least November 8, 2021, and thus cannot satisfy the constitutional one-year residency requirement. By swearing that he is "eligible" to represent New HD-165 in the Pennsylvania House of Representatives when he in fact would not be, Objector asserts that Jordan's filing is fatally deficient. *See* Objector's Br. at 14 (citing *Bolus*, 251 A.3d at 854 ("[A]n affidavit that includes sworn facts that were not true when the affidavit was executed renders the nomination petition materially defective and void, such that the nomination petition may be set aside."); *Pippy*, 711 A.2d at 1054 n.12 ("Clearly, if a nomination petition includes a candidate's affidavit in which the candidate states that he is eligible for the office he seeks, and he does not, in fact, meet the requirements of Article II, Section 5, such petition may be set aside by this court.")).

In Objector's view, the Commonwealth Court erred in making "the fulcrum of the analysis an inquiry into Mr. Jordan's good faith, rather than whether the affidavit is true or knowingly false." *Id.* at 10. Only when an affidavit satisfies the requisite elements—"*e.g.*, that the residence is truly stated, the person is eligible for office, is not a candidate for another party," and others—does it meet the Election Code's requirements. *Id.* at 11. In

the case of a *false* affidavit, Objector acknowledges, this Court has "stated plainly that amendments should be permitted in circumstances where such amendment would make the affidavit true and where the initial error was made in good faith." *Id.* at 12 (citing *Driscoll*, 847 A.2d at 49).

But in this case, falsity isn't the problem. Objector does not question the veracity of Jordan's given residence or allege any attempt to deceive. He merely observes that Jordan will have been a resident of New HD-165 for, at most, only nine months come Election Day, which Jordan does not contest. Objector submits that this alone is incurably disqualifying. *Id.* at 15, 16. As Objector puts it, Jordan's "case presents the unusual situation where a candidate could possibly act in good faith but fundamentally knows that there is nothing he can do to make an affidavit both legally sufficient and factually truthful." *Id.* at 12. He "is in an undesirable, but Constitutionally inescapable, situation of being ineligible for State Representative for the current cycle due to his own choice to move his residency from one legislative district to another in the year before an election." *Id.*

Anticipating Jordan's response, Objector notes that, at the evidentiary hearing and in his filings below, Jordan

> made essentially three arguments for why he met the residency test: (1) that he had lived in a district numbered as 165 since April of 2020; (2) that the residency requirement should be waived when redistricting happens late pursuant to a footnote in the 1992 appeals from the 1991 reapportionment; and (3) that there was no way anyone had lived in any district for a full year because the districts only came into existence on March 16 when the LRC plan attained force of law, so that Mr. Jordan's residence in the 165th district from March 16 until election day matched that of all candidates.

*Id.* at 17.

Beginning with the last of these assertions, Objector submits that Jordan "simply misconstrues the nature of what a legislative district is." *Id.* at 18 ("The LRC did not create

253 new corporate entities that sprang into effect on March 16, 2022."). "Voters maintain their residence at specific locations as set forth by the Election Code." *Id.* (citing 25 P.S. § 2814). "When the new plans achieve force of law, as this plan has, voters are resorted." *Id.* Voters immediately are eligible to vote in their new district, and they may run for the General Assembly where their house is located *if* they will have lived within the boundaries of the new district for at least a full year before the date of the general election. *Id.* "If they have moved, however, less than a year before an election, then they are only eligible if both their old and new residence remain in the same [newly constituted] district for the full year." *Id.*

On Jordan's second anticipated argument, Objector contends that footnote seven of this Court's decision in *1991 LRC* is inapplicable *dicta*. *Id.* at 21. That commentary raised, but "specifically left unresolved," a "tension that theoretically could arise between the Constitution's requirement that Senators serve four-year terms and the impact of a mid-term redistricting on Senators who switched districts but were not up for reelection." *Id.* The statement addressed the claim of a sitting state senator that the LRC's Final Plan, "by moving 'his' district across the state and changing the number of the district in which he lived," would leave the district's residents unrepresented for the latter half of his term if he was not seated in the new district that his residence had been redistricted into. *Id.* at 22. The Court made no ruling, but anticipated "a theoretical future claim by unrepresented citizens if the State Senate both refused to seat a relocated Senator and also refused to call a special election to replace him." *Id.* (citing *1991 LRC*, 609 A.2d at 350-56). Objector posits that scenario, speculative in any event, is distinct from the

situation that arises "when new maps take effect at the beginning of a legislative term." *Id.* (citing *Fagan v. Smith*, 41 A.3d 816 (Pa. 2012) (*per curiam*)).

Lastly, to the contention that Jordan meets the residency standard because his prior residence was in Old HD-165 under the previous plan and his current residence is in New HD-165 in the current plan, Objector responds that, "although creative," this claim similarly "misconstrues the nature of a district." *Id.* at 19. Districts are geographical entities, not numerical ones, and Jordan cannot satisfy the residency requirement merely by transferring the HD-165 label because "district numbers carry no magic." *Id.* And even if Jordan's "magic number theory" held water, Objector notes that it would be of no benefit to him on the stipulated facts. When Jordan moved to Swarthmore in February or March, he resided in a different district, Old HD-161, for several weeks before Swarthmore became part of New HD-165. Those few days or weeks contradict any claim that Jordan resided in a district denominated HD-165 continuously for a full year. *Id.* at 20-21.

Objector concludes that this case is not about "fundamental fairness" but rather "strict interpretation of the plain language of the Constitution." *Id.* Simply put, absent a constitutional amendment, the one-year residency requirement must be satisfied. "Because Mr. Jordan's candidate affidavit cannot be amended to render it a truthful sworn statement, [his] nomination petition must be set aside." *Id.* at 23.

As below, here Jordan relies almost exclusively upon footnote seven of *1991 LRC*. He asserts that this Court "foresaw this exact issue" when it observed that "the constitutional residency requirements may conflict with the constitutional mandate" of decennial redistricting, and that "it may be necessary that residency requirements be waived when the Commission reapportions the Commonwealth less than one year before

the election." Jordan's Amended Br. at 3 (quoting *1991 LRC*, 609 A.2d at 139 n.7). He claims that "no person could meet the one-year residency requirement set forth in Article II, Section 5 because the 'district' at issue was not in existence 365 days prior to the November 8, 2022, General Election." *Id.* at 4. Because "the newly created and significantly geographically different [HD-165] will have only been in existence for 230 days" come Election Day, Jordan suggests that "[a] waiver of the residency requirement, or a ruling that such requirement is inapplicable for this election cycle, is the only outcome that is practicable and applies equally to all voters, avoiding a host of federal Equal Protection issues." *Id.*

Given the stipulated facts, this case is considerably more straightforward to resolve on the merits than it has been to describe the circumstances in which we must rule. Article II, Section 5 of the Pennsylvania Constitution sets age, citizenship, and state and local residency qualifications to serve in the General Assembly. Regarding the local residency requirements for the Pennsylvania House, prospective Representatives "shall have been . . . inhabitants of their respective districts one year next before their election (unless absent on the public business of the United States or of this State)." PA. CONST. art. II, § 5. For this November's state legislative elections, that means candidates must have taken up residency within the boundaries of their respective *current* districts at least one year *before* November 8, 2022—*i.e.*, by November 7, 2021, at the latest—and must ultimately have resided within those boundaries continuously through Election Day.[19] *See Lesker*, 105 A.2d at 379 ("[I]n order to qualify under Article II, Section 5 . . . a

---

[19] The one-year residency look-back period will differ for special elections that do not coincide with the November general election.

candidate for assemblyman must be an inhabitant (a permanent resident) within his claimed legislative district; and he must have resided there, that is, maintained a permanent home establishment there, for at least a year."); *cf. Nomination Petition of Vidmer*, 442 A.2d 1203, 1205 (Pa. Cmwlth. 1982) ("Article II, Section 5 . . . provides, *inter alia*, that members of the House of Representatives shall have been 'citizens and inhabitants' of the State four years next before their election.  The general election for the [Pennsylvania] House seat Mr. Vidmer seeks will occur November 2, 1982.  The critical date when Mr. Vidmer must have been a citizen and inhabitant of Pennsylvania in order to qualify for the office he seeks is November 1, 1978.").

Before taking up the parties' arguments, we first clarify the procedural dynamic of a candidate qualification challenge under Article II, Section 5.  Section 910 of the Election Code requires that a would-be candidate for a seat in the General Assembly timely "file with his nomination petition his affidavit stating," *inter alia*, "that he is eligible for such office."  25 P.S. § 2870 ("Affidavits of candidates"); *see id.* § 2911(e) (requiring candidates for nomination by a political body to "append to each nomination paper offered for filing an affidavit . . . stating," *inter alia*, "that he is eligible for such office").  Anyone seeking to challenge the candidate's nomination petition must do so "within seven days after the last day for filing said nomination petition or paper" by filing a petition in the court "setting forth the objections thereto, and praying that the said petition or paper be set aside"; otherwise, the candidate's submission "shall be deemed valid."  *Id.* § 2937.  Generally, an objector seeking to disqualify a candidate on a constitutional basis will assert that the candidate's affidavit contains a false statement regarding his "eligib[ility] for such office."  *Id.* § 2870.  "If the court shall find" by a preponderance of the evidence "that said nomination paper . . .

was not filed by persons entitled to file the same, it shall be set aside." *Id.*; *see Street*, 516 A.2d at 794 (imposing the preponderance of the evidence burden of proof).

In Judge Fizzano Cannon's view, however, a false statement as to constitutional eligibility would not alone suffice to support setting aside the nomination petition. *Jordan*, slip op. at 13 n.7. For this she cites *Driscoll*, in which this Court held that, "before an affidavit may be declared void and invalid because it contains false information, there must be evidence that the candidate knowingly falsified the affidavit with an intent to deceive the electorate." 847 A.2d at 51 (citing *Pa. State Ethics Comm'n v. Baldwin*, 445 A.2d 1208, 1211-12 (Pa. 1982)). In *Driscoll*, a candidate for Congress conceded that he had incorrectly listed his address on his nomination petition and affidavit. When his filings were challenged on that basis, the Commonwealth Court permitted him to amend. *Id.* at 47. On appeal, we agreed with the Commonwealth Court's conclusion that the candidate did not provide the false address with the intent to deceive the electorate. *Id.* at 51. Central to this Court's decision, moreover, was the fact that there is no requirement that congressional candidates or elected members of Congress live within a given district, so the actual location of the candidate's residence within Pennsylvania was irrelevant to his qualifications. For that reason, the Court considered the defect to be benign and amendable. *Id.* at 53.

While it may be the case that a candidate who inadvertently provides incorrect information can amend his filing in the court's discretion and cure his error as in *Driscoll*, the circumstances in that case are distinguishable from a case presenting questions of constitutional ineligibility. Because a candidate either is or is not constitutionally eligible to run for office, the absence of a necessary qualification (here, Jordan's inability to satisfy

the local residency requirement by Election Day) cannot be cured by amendment. Therefore, whether the candidate *deliberately* swore falsely that he was "eligible for such office" with the intent to deceive has no bearing on the question. By way of example, if a ten-year-old citizen of Pennsylvania, or a non-citizen adult permanent resident of Pennsylvania, or a resident of New Jersey who owns vacation property in Pennsylvania, filed a nomination petition asserting his or her eligibility to run for the General Assembly, their good faith would have no bearing on whether those petitions were fatally defective. A would-be candidate who is constitutionally unqualified to serve is ineligible to run.

Objector asserts that Jordan cannot satisfy the one-year residency requirement because, by his own admission, he will not have inhabited the geographic area encompassing New HD-165 (or, hypothetically, a continuous sequence of districts enumerated HD-165) continuously for one year before Election Day. We agree. When he moved from Broomall to Swarthmore, Jordan's "respective district" changed from Old HD-165 to Old HD-161. By moving to a different district that was not later combined with the geographic area in which his previous residence was located, Jordan effectively reset the one-year clock that serves as a condition precedent to establishing eligibility for the state House seat for that new district. Since Jordan could not have satisfied the one-year residency, or "inhabitation," requirement in Old HD-161 by election's eve, November 7, 2022, the fact that Swarthmore later was incorporated into a district that the LRC had designated as New HD-165 in its Final Plan for the state House is of no moment. Indeed, it was merely coincidental that Jordan ended up in New HD-165 at some point after moving to Swarthmore; had he maintained his Broomall residence, he would have been redistricted into a third district, New HD-166.

To dispel any confusion about how residency requirements should operate for General Assembly elections immediately following a decennial legislative redistricting cycle, we offer the following observations. The most reasonable construction of Article II, Section 5's residency requirements—the one that best "protect[s] a candidate's right to run for office and the voters' right to elect the candidate of their choice," *Nomination Petition of Flaherty*, 770 A.2d 327, 331 (Pa. 2001)—is one that ties inhabitancy to fixed geographic areas, rather than numerical designations that can be altered at the LRC's discretion, even if the districts' lines do not change. Thus, in the event a Final Plan takes effect less than a year before the next election—which historically has always been the case[20]—candidates who satisfy all other constitutional and statutory requirements will be eligible to run in whatever new district (*if any*) contains the residence or residences in which they will have resided for at least one year before the next general (or special) election.

Consider the following non-exhaustive list of hypothetical scenarios:

**Scenario #1:** Candidate takes up residence in Old District A more than a year before the next election. The LRC's Final Plan does not alter Old District A's boundaries or change its designation. Candidate will be eligible to represent New District A if he (i) maintains his existing residence, (ii) moves to another part of Old District A before the Final Plan takes effect,

---

[20]     *See, e.g.*, *Holt v. 2011 Legislative Reapportionment Comm'n*, 38 A.3d 711, 715-16 (Pa. 2012) (*per curiam* Order of January 25, 2012) (ordering that the 2001 Final Plan "shall remain in effect until a revised final 2011 Legislative Reapportionment Plan having the force of law is approved"); *Albert v. 2001 Legislative Reapportionment Comm'n*, 790 A.2d 989, 991 (Pa. 2002) (*per curiam* Order of February 15, 2002) (approving 2001 Final Plan); *1991 LRC*, 609 A.2d at 134 (*per curiam* Order of February 14, 1992) (approving 1991 Final Plan); *In re Reapportionment Plan for Pa. Gen. Assembly*, 442 A.2d 661 (Pa. 1981) (approving 1981 Final Plan on December 29, 1981); *Commonwealth ex rel. Specter v. Levin*, 293 A.2d 15 (Pa. 1972) (approving 1971 Final Plan on February 7, 1972).

or (iii) moves to another part of New District A after the Final Plan takes effect.

**Scenario #2:** Candidate takes up residence in Old District A more than a year before the next election. The LRC's Final Plan does not alter Old District A's boundaries, but Old District A is redesignated New District B. Candidate will be eligible to represent New District B if he (i) maintains his existing residence, (ii) moves to another part of Old District A before the Final Plan takes effect, or (iii) moves to another part of New District B after the Final Plan takes effect.

**Scenario #3:** Candidate takes up residence in Old District A more than a year before the next election. The LRC's Final Plan alters Old District A's boundaries such that Candidate's residence now is located in New District B. Candidate will be eligible to represent New District B if he (i) maintains his existing residence, (ii) moves before the Final Plan takes effect to another part of Old District A that the Final Plan later incorporates into New District B, or (iii) moves to another part of New District B after the Final Plan takes effect.

**Scenario #4:** Candidate takes up residence in Old District A more than a year before the next election. The LRC's Final Plan combines the portion of Old District A in which Candidate's residence is located with a portion of Old District B, and designates the amalgamation New District C. Candidate will be eligible to represent New District C if he (i) maintains his existing residence, (ii) moves before the Final Plan takes effect to another part of Old District A that the Final Plan later incorporates into New District C, or (iii) moves to another part of New District C after the Final Plan takes effect.

**Scenario #5:** Candidate takes up residence in Old District A more than a year before the next election. Then he moves to Old District B less than a year before the next election. The LRC's Final Plan subsequently combines the portion of Old District B to which Candidate moved with the portion of Old District A in which Candidate formerly resided, and designates the amalgamation New District C. Because Candidate will have lived within New District C's geographical boundaries for at least one year prior to the election, Candidate will be eligible to represent New District C if he maintains his existing residence or moves to another part of New District C after the Final Plan takes effect.[21]

---

[21] Scenario #5 essentially is a variant of Scenario #4(ii). In both, the candidate changes residences less than a year before the next election. Scenario #5 is presented separately in order to highlight the gamble that a prospective candidate takes when deciding to move to a different (old) district without knowing whether the geographical area containing the candidate's new residence ultimately will be combined with the geographical area in which he or she previously resided. If the LRC's Final Plan combines

**Scenario #6:** Candidate takes up residence in Old District A more than a year before the next election. Then he moves to Old District B less than a year before the next election. The LRC's Final Plan subsequently designates the portion of Old District B to which Candidate moved as New District C, but does not combine that portion of Old District B to which Candidate moved with the portion of Old District A in which Candidate formerly resided when creating New District C. Candidate will not be eligible to represent any New District that cycle.

Reviewing this case against the foregoing scenarios demonstrates Jordan's dilemma. Had Jordan maintained his Broomall residence, he would have been eligible to run for New HD-166, the House district that came to encompass that portion of Broomall in which his previous residence was situated, after the LRC's Final Plan took effect on March 16. *See* Scenario #3. Likewise, had he established his residence in Swarthmore (Old HD-161) before November 8, 2021, he would have been eligible to run in the new district that encompassed Swarthmore after it nominally was redesignated New HD-165, assuming he maintained his residency there continuously through Election Day. *See* Scenario #2. And if the LRC's Final Plan had combined the geographic area containing his new residence in Swarthmore with the geographic area containing his old residence in Broomall, he would have been eligible to represent that newly formed district as well even though Broomall and Swarthmore were located in different (old) districts when he moved. *See* Scenario #5. Unfortunately for Jordan, the stipulated facts squarely place him in Scenario #6. Because he moved from Broomall (Old HD-165) to Swarthmore (Old HD-161) before the LRC's Final Plan took effect, whether Jordan's one-year residency

---

the two areas, the candidate lucks out and will be eligible to represent that geographical entity—*i.e.*, the New House District—in the General Assembly. Otherwise, the would-be candidate will be ineligible for any state legislative office until the candidate will have resided in the newly constituted district for one year preceding the election in which the candidate seeks the office.

clock reset this cycle depended upon whether the LRC subsequently fashioned New HD-165 to encompass both Jordan's Broomall and Swarthmore addresses. But it did not. That the LRC's Final Plan nominally redesignated the portion of Old HD-161 in which Jordan resided for several days or weeks as New HD-165 makes no difference. Come Election Day, Jordan will only have resided in the geographic area comprising New HD-165 for no more than nine months.

Jordan suggests that Article II, Section 5's residency requirements should be waived or ruled "inapplicable for this election cycle" so as to "avoid[ ] a host of federal Equal Protection issues," none of which he specifically identifies. Jordan's Amended Br. at 4. He relies heavily upon this Court's supposition in *1991 LRC* that a tension theoretically exists between the residency requirements and the decennial redistricting process. *See* 609 A.2d at 139 n.7. His resort to that conjecture, which was *dicta*, is unpersuasive for a number of reasons. First, the potential conflict identified by the Court in that footnote concerns only incumbent senators whose "senatorial districts [would] not [have been] slated for general election" for another two years—that is, until the LRC's Final Plan redistricted them out of their existing districts, thereby potentially leaving those districts without incumbent representation in the Pennsylvania Senate. *Id.* at 139. Plainly, Jordan is not an incumbent senator, so this circumstance does not pertain to him. Moreover, the Constitution expressly contemplates that scenario and establishes a process in the event of its occurrence. *See* PA. CONST. art. II, § 17(f) ("Any district which does not include the residence from which a member of the Senate was elected whether or not scheduled for election at the next general election shall elect a Senator at such election.").

With respect to the potential need to waive residency requirements "when the [LRC] reapportions the Commonwealth less than one year before an election," *1991 LRC,* 609 A.2d at 139 n.7, that comment, too, referred to the effect redistricting might have on incumbent senators, specifically those who would be forced to seek reelection in the new districts into which they have been redistricted in the middle of their four-year term. The Court was responding to the claims of one of the appellants who "allege[d] that it will be impossible for an incumbent senator [such as the appellant] to have resided in his district for a year before the election, *and for all four years of his tenure* (as mandated by the Constitution) if the Senatorial Districts are altered." *Id.* (emphasis added). The Court found this issue unripe "because no senator has suffered adverse consequences in the form of losing a seat for failure to satisfy the residency requirements," adding that it would "reserve ruling on the issue until such time that a particular party suffers injury, at which point we will address the apparent conflict between the constitutional provisions." *Id.*

Setting aside the non-binding nature of the Court's commentary, we note that the *1991 LRC* Court may have misapprehended the potential for conflict arising from these unusual circumstances. We are not aware of the consequences described having occurred since the adoption of the redistricting provisions of Article II, Section 17 in 1968. And under the rule we announce herein, an incumbent senator who is redistricted out of his existing district would immediately be eligible to run in whatever Senate district the LRC's Final Plan places his existing residence, provided the incumbent has lived in the geographic area comprising his new Senate district for one full year before the next election in question. As for the requirement that Senators "reside in their respective districts during their terms of service," PA. CONST. art. II, § 5, a nomination petition

challenge does not appear to be the proper vehicle to test whether an *incumbent* legislator currently satisfies his obligation in this regard. After all, as we acknowledged above, it is the Senate's constitutional prerogative to "judge" the "qualifications of its *members*." PA. CONST. art. II, § 9 (emphasis added). As the Court recognized three decades ago, the "apparent conflict" and prospects of a waiver in this rare context are "issues and possible resolutions *for the Senate to decide*." *1991 LRC*, 609 A.2d at 139 n.7 (citing *Jones*, 476 A.2d 1287) (emphasis added). And nothing in the Court's discussion reasonably could be construed to apply to a non-incumbent *candidate* for a seat in the Pennsylvania *House*, which, unlike a Senate seat, comes up for election every two years and in sync with decennial redistricting. Thus, Jordan's reliance on footnote seven is misplaced.

Jordan could not swear on his affidavit in conformity with the Constitution—and to his credit *did* not swear without qualification—that he would have been a resident of *New* HD-165 for at least one year before Election Day. So he was constitutionally ineligible to run for that district's respective seat in the Pennsylvania House of Representatives this cycle—and indeed, under these circumstances, ineligible to pursue a House seat in any newly constituted House district. It is undeniably unfortunate that, every ten years, some individuals will be disqualified from legislative office merely as a consequence of redistricting—although this is not what happened to Jordan, whose residential changes earlier this year would have disqualified him from the House at this November's election even if redistricting had not occurred. However, serendipitously, others who would have been ineligible under the former map might find themselves residentially qualified within the boundaries of their new district (Scenario #5). In any event, the principled concern animating our discussion in *1991 LRC*—that, simply by virtue of redistricting, certain

citizens might be denied continuous representation in the state Senate—is not present in this scenario. There is no question that the residents of New HD-165 will be represented. The issue is only by whom. In this cycle, it cannot be by Jordan, who is constitutionally ineligible to hold that office.

Chief Justice Baer and Justices Todd, Donohue and Dougherty join the opinion.

Justice Brobson files a dissenting opinion.

Justice Mundy did not participate in the consideration or decision of this matter.